**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>              Plaintiff,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>              Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>              Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>              Plaintiff,<br><br>    v.<br><br>LARRY WARSHAW AND CAROL WARSHAW AS TRUSTEES FOR CAROL ANN ENTERPRISES, INC. PENSION PLAN, SAJUST, LLC, and MARK D. WEINBERG,<br><br>              Defendants. | Adv. Pro. No. _____<br><br>**COMPLAINT** |

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, as and for his Complaint, alleges as follows:

## NATURE OF THE ACTION

1.      The Trustee commences this adversary proceeding to prevent certain third party plaintiffs, whose names appear in the caption above as defendants herein (collectively, the "Third Party Plaintiffs"), from undermining this Court's continuing jurisdiction over the estate of BLMIS and its customers' property.  By commencing actions (the "Third Party Actions") against Steven B. Mendelow ("Mendelow"), the Third Party Plaintiffs threaten the orderly administration of the BLMIS estate and seek to diminish the pool of assets from which the Trustee can make equitable and *pro rata* distributions to the victims of Madoff's fraud.

2.      By protecting this Court's jurisdiction over the administration of the BLMIS estate, the Trustee seeks to ensure that customer property[1] is recovered and distributed to the victims of Madoff's massive Ponzi scheme in a fair and efficient manner consistent with SIPA and the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code").

3.      The Trustee has commenced an adversary proceeding against Mendelow and related entities and individuals (the "Mendelow Defendants") in this Court, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (BRL) (Bankr. S.D.N.Y., filed November 24, 2010) (the "Trustee's

---

[1] Under section 78*lll*(4) of SIPA, "customer property" is defined as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

Mendelow Action"), seeking to recover the more than $20 million that the Mendelow Defendants received in fraudulent and unauthorized transfers from BLMIS, which belongs to BLMIS and its defrauded customers and creditors. In a separate action, the Trustee filed a complaint against FGLS Equity, LLC ("FGLS") for avoidance of preferential transfers (the "Trustee's FGLS Action"). *Picard v. FGLS Equity, LLC*, Adv. Pro. No. 10-05191 (Bankr. S.D.N.Y. filed Dec. 3, 2010) alleging that FGLS was an investment vehicle operated by Mendelow through which he invested other people's money in BLMIS and from which Mendelow received subsequent transfers.

4.     The Third Party Actions threaten to thwart the Trustee's efforts, as the Third Party Plaintiffs seek to recover fictitious profits and unauthorized transfers for themselves directly from Mendelow. To allow the Third Party Actions to proceed would usurp the Trustee's authority and divest him of his power to marshal customer property for equitable distribution.

5.     Each of the Third Party Actions asserts claims belonging to the Trustee. Even as to any causes of action that do not belong to the Trustee, each violates the automatic stay and various stay orders issued by the United States District Court for the Southern District of New York, as the Third Party Plaintiffs seek recovery of the <u>same</u> funds sought by the Trustee, based on the <u>same</u> operative facts and against the <u>same</u> defendants as the Trustee's Mendelow Action. The Third Party Plaintiffs are attempting to recover on the Trustee's fraudulent transfer claims against the Mendelow Defendants. As they concede in their complaints, the losses suffered by the Third Party Plaintiffs were the loss of funds that were invested in BLMIS and then wrongly transferred from BLMIS to the Mendelow Defendants. They therefore seek to control or interfere with property of the estate, or to collect on claims against the debtor, in violation of section 362(a).

6. Further, should the Third Party Plaintiffs succeed, they would undoubtedly be subsequent transferees of avoidable transfers to Mendelow and Trustee would then seek to avoid the transfer of such, which would be grossly inefficient and a waste of judicial resources.

7. Accordingly, the Trustee respectfully requests that the Court: (i) declare that the Third Party Actions violate the Stay Orders, section 78eee(b)(2)(B) of SIPA and the automatic stay and are void *ab initio* with respect to Mendelow; and (ii) issue a preliminary injunction prohibiting the Third Party Plaintiffs from pursuing the Third Party Actions, as against Mendelow, or any other actions as against the Mendelow Defendants, and from pursuing discovery from the Trustee, until such time as the Trustee has completed his action against the Mendelow Defendants.

## JURISDICTION AND VENUE

8. This is an adversary proceeding brought in this Court—the Court in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (BRL) (Substantively Consolidated) is pending. The SIPA proceeding is a combined proceeding with the Securities and Exchange Commission (the "SEC") and was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 prior to its removal to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and sections 78eee(b)(2)(A) and (b)(4) of SIPA.

9. An action for a declaratory judgment is properly commenced as an adversary proceeding pursuant to Rules 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedure.

10.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

11.     Venue in this district is proper under 28 U.S.C. § 1409.

12.     This court has personal jurisdiction over the Third Party Plaintiffs pursuant to Bankruptcy Rule 7004(f).

## BACKGROUND, THE TRUSTEE AND STANDING

13.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents and criminally charged with a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. 240.10b-5 in the United States District Court for the Southern District of New York (the "District Court"), captioned *United States v. Madoff*, No. 08 MAG 2735.[2]  Contemporaneously, the SEC filed a complaint in the District Court against, among others, Madoff and BLMIS (Case No. 09-CV-10791) The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

14.     On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of SIPC.  Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

15.     Also on December 15, 2008, the District Court granted the SIPC application and entered a Protective Decree, which was consented to by BLMIS.  The Decree, in pertinent part:

---

[2] On March 10, 2009, the criminal case was transferred to Judge Denny Chin in the District Court and was assigned a new docket number, No. 09 CR 213 (DC).

(i) appointed the Trustee for the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA; (ii) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA; and (iii) removed the case to this Court pursuant to section 78eee(b)(4) of SIPA.

16.     In an order entered on December 15, 2008, the District Court declared that "all persons and entities are stayed, enjoined and restrained from directly or indirectly . . . interfering with any assets or property owned, controlled or in the possession of [BLMIS]." *SEC v. Bernard L. Madoff*, 08-CIV-10791 (LLS), ECF No. 4 ¶ IV (reinforcing automatic stay); *see also* Order on Consent Imposing Preliminary Injunction Freezing Assets and Granting Other Relief Against Defendants, Dec. 18, 2008, ECF No. 8 ¶ IX ("no creditor or claimant against [BLMIS], or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the control, possession or management of the assets subject to the receivership."); Partial Judgment on Consent Imposing Permanent Injunction and Continuing Other Relief, Feb. 9, 2009, ECF No. 18 ¶ IV (incorporating and making the December 18, 2008 stay order permanent). (These orders are collectively referred to as the "Stay Orders.")

17.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

18.     On March 12, 2009, Madoff pled guilty to an 11-count criminal information.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  *See United States v. Madoff*, No. 09 CR 213 (DC), Dkt. No. 57, Plea Hr'g Tr. at 23:14–17.

19.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court entered an order substantively consolidating the Chapter 7 estate of Madoff into the SIPA Proceeding.

20.     Appointed under SIPA, the Trustee is charged with recovering and distributing customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  Consistent with his duties, the Trustee is marshaling BLMIS's assets, and is well underway in that process.

21.     The assets recovered, however, will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue avoidable transfers and other recovery actions.  Absent these recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

22.     Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code.  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case, to the extent consistent with SIPA.

23.     In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA pursuant to 15 U.S.C. §§ 78aaa *et seq*.

24.     The Trustee is a real party in interest and has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

a.      The Third Party Plaintiffs request relief that will affect "customer property" as defined in 15 U.S.C. § 78*lll*(4).

b.      The Third Party Plaintiffs request relief that may affect the distribution of customer property and the orderly administration of the estate.

c.      BLMIS's customers could be injured in the absence of the Trustee's filing of this Complaint.

d.      The Trustee will not be able to fully satisfy all claims through SIPC advances.

**THE PONZI SCHEME**

22.     Madoff founded BLMIS in 1960.  Until his arrest, Madoff was the sole member and chairman of BLMIS.  BLMIS had its principal place of business in New York and engaged in three primary types of business: market making, proprietary trading, and investment advisory services.  BLMIS was registered with the SEC as a broker-dealer and then registered in 2006 as an investment adviser.  Pursuant to its registration as a broker-dealer, BLMIS was a member of SIPC.

23.     Madoff solicited billions of dollars under false pretenses and failed to invest investors' money as promised.  Instead, he deposited investors' money in a bank account at J.P. Morgan Chase Manhattan Bank.  Madoff represented to clients and prospective clients that he

would invest their money in shares of common stock, options and other securities and would, at their request, return profit and principal. As the world is now aware, virtually no securities were purchased by Madoff for his customers.

24. By early December 2008, BLMIS generated statements for its approximately 4,900 active customer accounts. When added together, these statements erroneously showed that the customers of BLMIS had approximately $64.8 billion invested with BLMIS. In reality, BLMIS had assets on hand worth only a small fraction of that amount. Madoff's massive Ponzi scheme imploded and came to an end on December 11, 2008, the date on which he was arrested.

## THE COURT-ORDERED CLAIMS ADMINISTRATION PROCESS

25. The Trustee sought and obtained a Court order to implement a customer claims process in accordance with SIPA.

26. Pursuant to an application of the Trustee dated December 21, 2008 (ECF No. 8), this Court entered the Claims Procedures Order (ECF No. 12), which directed, among other things, that on or before January 9, 2009: (a) a notice of the commencement of this SIPA Proceeding be published; (b) a notice of the liquidation proceeding and claims procedure be given to persons who appear to have been customers of BLMIS; and (c) notice of the liquidation proceeding and a claim form be mailed to all known general creditors of BLMIS.

27. More than 16,000 potential customers, general creditor and broker-dealer claimants were included in the mailing of the notice.

28. Under the Claims Procedures Order, claimants were directed to mail their claims to the Trustee. All customers and creditors were notified of the mandatory, statutory bar date for

filing of claims under section 78fff-2(a)(3) of SIPA, which was July 2, 2009 (the "Bar Date"). The Trustee also provided several reminder notices.[3]

29.     By the Bar Date, the Trustee had received 16,239 customer claim forms.

## THE TRUSTEE'S ACTIONS AGAINST THE MENDELOW DEFENDANTS

### (1)     *Picard v. Mendelow*

30.     On November 23, 2010, the Trustee commenced an action against the Mendelow Defendants, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (Bankr. S.D.N.Y.). In his complaint (the "Trustee's Mendelow Complaint"), the Trustee seeks the return of $20,250,720 in principal and fictitious profits under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3), sections 105(a), 544, 548(a), 550(a) and 551 of the Bankruptcy Code, N.Y. Debt. & Cred. Law § 270 *et seq.*, NY CPLR 203(g) and 213(8), and other applicable law, for fraudulent and subsequent transfers in connection with certain transfers of property by BLMIS to or for the benefit of the defendants. By his action, the Trustee seeks to set aside the transfers to the Mendelow Defendants and preserve the property for the benefit of the defrauded customers of BLMIS. (Tr. Mendelow Compl. ¶ 12.)

31.     In his complaint, the Trustee alleges that Mendelow was a beneficiary of the BLMIS Ponzi scheme for almost twenty years, dating back to at least the 1980s when he operated Telfran Associates Ltd. ("Telfran"). (Tr. Mendelow Compl. ¶ 3.) The Trustee alleges that from 1989 until 1992, using Telfran, Mendelow funneled money from investors to BLMIS through the accounting firm owned and operated by Frank Avellino and Michael Bienes

---

[3] On May 21, 2009, the Trustee mailed a reminder notice to customers who had not yet filed a claim that the statutory bar date was July 2, 2009. On June 22, 2009, the Trustee mailed a final bar date reminder notice (the "Final Reminder Notice") to 7,766 known past and present customers of BLMIS from whom a claim had not yet been received. In addition, the Trustee posted the Final Reminder Notice on the Trustee's website.

("A&B"). (*Id.* ¶¶ 3-4.) Mendelow profited from the spread between the guaranteed rates of return provided to Telfran investors and the guaranteed rates of return provided to A&B investors. (*Id.* ¶ 4.) In 1993, Mendelow and Telfran were fined and permanently enjoined by the SEC from selling unregistered securities and Telfran was forced to return money to investors. (*Id.* ¶ 5.)

32.     The SEC's injunction as to Telfran did not stop Mendelow from profiting from BLMIS.    Under a new arrangement between Madoff and Mendelow, Mendelow was compensated directly for money he steered to BLMIS through fraudulent side payments (an annual payment made to Mendelow for referring former Telfran investors to BLMIS). (*Id.*) The majority of the money BLMIS returned to the Telfran investors was reinvested under this new scheme. (*Id.*) The Trustee has alleged that these fraudulent side payments totaled in excess of $5.1 million dollars between 1993 and 2007. (*Id.* ¶ 87.) From at least 1993 to 1996, Mendelow also received a guaranteed rate of return of 17% on his investments. (*Id.* ¶ 88.)

33.     The Trustee alleges that the Mendelow Defendants knew or should have known that they were benefiting from manipulated returns and that BLMIS was engaged in fraud based on a number of indicia of fraud, including the guaranteed rate of return and the patterns of returns in various accounts.    Mendelow closely tracked his fraudulent side payments and guaranteed rate of return and was able to direct the value of his accounts based upon his calculations of these amounts. (*Id.* ¶¶ 93-96.)

34.     The Trustee alleges that, among other things, the guaranteed of return should have put the Mendelow Defendants on inquiry notice that Madoff was engaged in fraudulent trading practices. (*Id.* ¶ 89.) From at least 1993 to 2007, BLMIS reported implausibly consistent, and

consistently high, rates of return for the Mendelow Defendants' accounts—in some instances as high as 43%, 34.7%, and 28.7%—while other of their accounts invested in the same purported strategy received returns that were less than half those amounts, ranging from no greater than 10.4% to 14.5% over the same period. (*Id.* ¶¶ 10, 89.) It was not plausible that a single investment firm could simultaneously achieve such different results, results which permitted the Mendelow Defendants to collectively withdraw more than $11.4 million in other people's money from BLMIS. (*Id.*)

The Trustee alleges that Mendelow received customer property from a number of different BLMIS accounts. Not only did he have his own investment account, but he controlled that of his wife, Nancy, as well as the accounts of multiple entities. In addition to Mendelow's and Nancy Mendelow's investment accounts (both of which received the fraudulent side payments and a guaranteed rate of return), the Trustee believes Mendelow was a subsequent transferee of BLMIS accounts held in the name of FGLS Equity LLC ("FGLS") and C&P Associates (which also received fraudulent side payments and a guaranteed rate of return). The Trustee has alleged that over the life of the accounts, the Mendelow Defendants received transfers of $11,435,809 of other people's money. (*Id.* ¶¶ 8, 49, 106.)

35. Based on Mendelow's status as an insider and someone on inquiry notice of the fraudulent practices of BLMIS, the Trustee is also seeking $8,814,911 in the return of principal. (*Id.* ¶ 106.) In total, the Trustee is seeking more than $20 million from the Mendelow Defendants. This is a substantial sum of money and the Trustee has serious concerns about his ability to collect the full amount of such a judgment from Mendelow, his family and his affiliated entities.

36.     Based on the Trustee's investigation to date, the Mendelow Defendants recoverable assets may be insufficient to satisfy the Trustee's claims in his action.

**(2)     *Picard v. FGLS Equity, LLC***

37.     In a separate action, the Trustee filed a complaint against FGLS for avoidance of preferential transfers (the "FGLS Action"). *Picard v. FGLS Equity, LLC*, Adv. Pro. No. 10-05191 (Bankr. S.D.N.Y. filed Dec. 3, 2010). In the Trustee's Complaint (the "Trustee's FGLS Complaint"), the Trustee alleges that FGLS was an investment vehicle operated by Mendelow through which he invested other people's money in BLMIS and from which Mendelow received subsequent transfers. (Tr. FGLS Compl. ¶ 9.)

## THE THIRD PARTY ACTIONS VIOLATE THE EXISTING STAYS AS THEY SEEK CUSTOMER PROPERTY FROM MENDELOW

38.     There are currently two Third Party Actions known to the Trustee to be pending against Mendelow that the Trustee is seeking to enjoin.

39.     Each of the Third Party Actions seeks customer property in the guise of damages.

40.     The Third Party Actions name other defendants in addition to Mendelow. At this time, the Trustee seeks an injunction only as to Mendelow.

## THE THIRD PARTY ACTIONS

### *Warshaw v. Mendelow*, Index No. 652173/2010 (Sup. Ct. N.Y. Co., filed Dec. 3, 2010)

41.     On or about December 3, 2010, Larry Warshaw and Carol Warshaw, as Trustees for Carol Ann Enterprises, Inc. Pension Plan (the "Pension Plan") and Sajust, LLC ("Sajust" and collectively with the Pension Plan, the "Warshaw Plaintiffs") commenced a derivative action in the Supreme Court of New York (the "New York Supreme Court") against Mendelow,

Koningsberg, Wolf & Co., P.C. ("KW") and Paul Koningsberg ("Koningsberg"). *Warshaw v. Mendelow*, Index No. 652173/2010 (Sup. Ct. N.Y. Co. filed Dec. 3, 2010). Plaintiffs filed an amended complaint on February 17, 2010 (the "Warshaw Complaint").

42.     Per the Warshaw Complaint, Mendelow furnished tax, accounting, and investment services to Larry Warshaw ("Warshaw") and several of Warshaw's family-owned businesses through his employment at KW. (Warshaw Compl. ¶ 7.) On Mendelow's advice, Warshaw and several of his relatives formed Sajust for the purpose of investing in FGLS. (*Id.* ¶ 8.) The Pension Plan, an employees' pension trust for a business owned by Warshaw and his brother, was also invested in FGLS. (*Id.*) The Trustees for the Pension Plan are Warshaw and Carol Warshaw. (*Id.* ¶ 12.) As against Mendelow, the Warshaw Complaint asserts claims for professional malpractice, breach of fiduciary duty, fraud and conspiracy to defraud, negligent misrepresentation, and aiding and abetting fraud. (*Id.* ¶¶ 82-110.)

43.     The Warshaw Plaintiffs seek $2,676,434 to reimburse their principal lost through their investment in FGLS, which was fully invested in BLMIS. *Id.* ¶ 8. The Warshaw Plaintiffs' own allegations make clear that the losses they suffered were losses of funds that were invested in BLMIS, and the damages they seek to recover consist of BLMIS customer property wrongly transferred to the Mendelow Defendants.

- "Defendants exploited the trust that Larry Warshaw [] had developed as the result of KW serving as a long-time financial advisor, tax preparer and accountant for him and several of his family owned businesses [] to fraudulently induce Plaintiffs' investments into FGLS . . . for the purpose of investing with BLMIS.") (Warshaw Compl. ¶ 7.)

- "Upon the advice of KW, as communicated principally by Mendelow, Warshaw and several of his relatives formed Sajust for the purpose of investing in FGLS. Sajust, and Carol Ann Enterprises, Inc. Pension Plan . . . lost a total of $2,676,434 in principal in FGLS." (*Id.* ¶ 8.)

- "The Defendants caused all of FGLS'[s] capital to be invested with BLMIS." (*Id.* ¶ 49.)

- "Defendants substantially aided and abetted BLMIS in defrauding Plaintiffs of $2,676,434." (*Id.* ¶ 108; *see also id.* ¶¶ 88, 93, 102, 106 (seeking compensatory damages on each cause of action "believed to be in excess of $2,676,434").)

44.     The Warshaw Plaintiffs further acknowledge that the recoveries that they are seeking constitute funds derived from the BLMIS Ponzi scheme:

- "Before being sanctioned by the SEC, Mendelow earned a percentage of the funds he originated for Madoff. Subsequent to being sanctioned by the SEC, Mendelow demanded and received fraudulent payments from Madoff totaling in excess of $5 million based on the number of investors he solicited to invest with BLMIS. Further, Mendelow arranged for BLMIS accounts to be established for the benefit of himself and his family members which received fixed rates of return ranging from 28% to 43% per year." (*Id.* ¶ 3.)

- "Mendelow extracted from Madoff an agreement to pay him kick-backs based on the amount of money former Telfran clients, or new clients, invested in BLMIS. In sum, Mendelow received in excess of $5 million in fraudulent side payments from Madoff after the filing of the SEC enforcement actions. Moreover, Madoff rewarded Mendelow by providing favorable rates of return, up to 40% per year, on BLMIS accounts established for the benefit of Mendelow and some of his family members." (*Id.* ¶ 33.)

45.     The Warshaw Complaint also makes numerous allegations regarding Mendelow's and Konigsberg's histories with BLMIS, Madoff and the Ponzi scheme, KW's activities, and Mendelow's alleged inducement of the Warshaw Plaintiffs to invest in FGLS. However, the simple matter is that the Warshaw Plaintiffs invested in FGLS, lost that investment through the collapse of BLMIS, and now want to place themselves ahead of other victims.

**<u>Mark. D. Weinberg v. Steven Mendelow, Konigsberg, Wolf & Co., and Paul Konigsberg</u>, Index No. 652222/2010 (Sup. Ct. N.Y. Co., filed Dec. 9, 2010)**

46.     On or about December 9, 2010, Weinberg commenced a derivative action in the New York Supreme Court against Mendelow, KW, and Koningsberg.  *Weinberg v. Mendelow*, Index No. 652222/2010 (Sup. Ct. N.Y. Co. filed Dec. 9, 2010).  Weinberg filed a complaint in this action on February 17, 2010 (the "Weinberg Complaint").

47.     Per the Weinberg Complaint, Mendelow induced Weinberg to personally invest a total of $1,000,000 in FGLS for the purpose of investing in BLMIS in 2003 and 2004. (Weinberg Compl. ¶ 7.)  As against Mendelow, the Weinberg Complaint asserts claims for professional malpractice, breach of fiduciary duty, fraud and conspiracy to defraud, negligent misrepresentation, and aiding and abetting fraud.  (*Id.* ¶¶ 71-101.)

48.     Weinberg seeks $1,600,000 to reimburse the $1,000,000 in principal and an additional $600,000 in purported profit in connection with his investment in FGLS, which was fully invested in BLMIS.  *Id.* ¶ 7.  Weinberg's own allegations make clear that the funds he seeks to recover consist of BLMIS customer property:

- "Mendelow induced Plaintiff to invest personally in FGLS . . . for the purpose of investing with BLMIS. Upon the advice of Mendelow, Plaintiff invested a total of $1,000,000 in FGLS in 2003 and 2004. Plaintiff never withdrew any funds from FGLS and therefore has lost at least $1,000,000." (*Id*. ¶7.)

- "Defendants caused all of FGLS's capital to be invested with BLMIS." (*Id.* ¶ 38.)

- "In and around 2002 and 2003, KW, through Mendelow, advised Plaintiff to invest in FGLS, which invested in BLMIS directly. Based on this advice, on or around September 9, 2003, Plaintiff invested $500,000 in FGLS, and on or around April 12, 2004, an additional $500,000." (*Id.* ¶ 56.)

- "Defendants advised Plaintiff that as of November 30, 2008, Plaintiff's account was valued in excess of $1,600,000, when, in fact, as a result of the wrongdoing, Plaintiff has likely lost his entire investment as he never withdrew any funds from FGLS." (*Id.* ¶ 60.)

- "Defendants substantially aided and abetted BLMIS and Madoff in defrauding Plaintiff of at least $1,600,000." (*Id.* ¶ 99; *see also id.* ¶¶ 77, 83, 92, 97 (seeking damages for each cause of action of "at least $1,600,000").)

49. Weinberg's Complaint also makes it clear that the recoveries that he is seeking constitute funds derived from the BLMIS Ponzi scheme:

- "Before being sanctioned by the SEC, Mendelow earned a percentage of the funds he originated for Madoff. Subsequent to being sanctioned by the SEC, Mendelow received payments from Madoff totaling more than $5 million for his solicitation of investors with BLMIS." (Weinberg Compl. ¶ 3.)

- "Mendelow, Glantz and A&B shared the spread between the returns A&B received from BLMIS and the returns Telfran promised to its underlying investors. Consequently, Telfran received millions in profits for originating funds for BLMIS." (*Id.* ¶ 20.)

- "Mendelow extracted from Madoff an agreement to pay him kickbacks based on the amount of money former Telfran clients, or new clients, invested in BLMIS. In all, Mendelow received in excess of $5 million in side payments from Madoff after the filing of the SEC enforcement actions. Madoff rewarded Mendelow by providing favorable rates of return, up to 40% per year, on BLMIS accounts established for the benefit of Mendelow and some of his family members." (*Id.* 22.)

50. Like the Warshaw Complaint, the Weinberg Complaint, also makes numerous allegations irrelevant to the fact that Weinberg seeks to place himself ahead of other BLMIS victims. As with the Warshaw Plaintiffs, Weinberg's appropriate method of recovery is through FGLS, not Mendelow directly.

**THE THIRD PARTY ACTIONS THREATEN THIS COURT'S JURISDICTION AND THE ADMINISTRATION OF THE ESTATE AND AN INJUNCTION IS NECESSARY TO PRESERVE AND PROTECT THE ESTATE**

51. The Third Party Actions are each active and pending in the Supreme Court of the State of New York.

52.     The Third Party Plaintiffs seek to take for themselves funds that otherwise would be recoverable by the Trustee and equitably distributed to customers of BLMIS in accordance with this Court's March 1, 2010 Net Equity Decision and March 8, 2010 Net Equity Order.

53.     The Third Party Actions all seek to tap into the same pool of money as the Trustee, and the "damages" sought by the Third Party Plaintiffs are nothing more than what they seek as purported customers or creditors of the estate.

## COUNT ONE
## DECLARATORY RELIEF

54.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully alleged herein.

55.     The Trustee seeks a declaration that the Third Party Actions violate the automatic stay provisions under 11 U.S.C. § 362(a), 15 U.S.C. § 78eee(b)(2)(B) and the Stay Orders and are therefore void *ab initio*.  This declaratory relief is warranted for, without limitation, the following reasons:

        a.      By seeking to recover damages from Mendelow, the Third Party Actions improperly contravene the claims administration process in the SIPA proceeding and side-step the Trustee's exclusive right to seek recovery of fraudulently transferred property in direct violation of 11 U.S.C. § 362(a)(1) and (6).

        b.      Additionally, the Third Party Actions improperly seek to recover on a claim against BLMIS and/or Madoff in violation of 11 U.S.C. § 362(a)(1) and seek to obtain possession of property of BLMIS and/or Madoff in direct violation of 11 U.S.C. § 362(a)(3), 15 U.S.C. § 78eee(b)(2)(B) and the Stay Orders.

56.     The Court has authority pursuant to sections 105(a) and 362(a) of the Bankruptcy Code to issue declaratory relief because this controversy is actual and justiciable, and the Court has jurisdiction over matters affecting BLMIS property and the effective and equitable administration of the estate of BLMIS and/or Madoff.

## COUNT TWO
## PRELIMINARY INJUNCTIVE RELIEF

57.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully alleged herein.

58.     The Trustee seeks an Order that any further prosecution of the Third Party Actions be preliminarily enjoined pursuant to section 105(a) of the Bankruptcy Code, made relevant to these proceedings by section 78fff(b) of SIPA, pending the completion of the Trustee's Mendelow Action.   Specifically, the Trustee requests that this Court enjoin the prosecution of the Third Party Actions for, without limitation, the following reasons:

        a.     The Third Party Actions improperly infringe on the jurisdiction of this Court.  Any funds recovered in the Third Party Actions have a strong likelihood of consisting of customer property, recoverable by the Trustee pursuant to section 78fff-2(c)(3) of SIPA.  As such, further prosecution of these actions could ultimately result in another court's determining how potential customer property is distributed among certain BLMIS customers and creditors.

        b.     There is an inadequate remedy at law to protect and preserve the assets that constitute customer property. The Third Party Actions threaten the administration of the liquidation and an injunction is necessary to preserve and protect customer property and the

Trustee's efforts to gather and collect customer property for the benefit of the victims who have filed claims.

c.      An injunction will prevent the substantial confusion of other investors and potential plaintiffs with respect to whether they must file separate actions to protect their interests.

d.      An injunction will avoid the possibility of inconsistent decisions and will ensure preservation of uniformity of decision.

e.      An injunction will allow the Trustee to avoid appearing in the Third Party Actions, and thus prevent the Trustee from incurring needless litigation costs.

f.      The injunction will not harm the public interest, and, in fact, is in the best interest of BLMIS customers and the orderly administration of the claims administration process.

59.      The Trustee believes that the injunction requested herein is necessary and appropriate to carry out his duties in accordance with the provisions of SIPA and the Bankruptcy Code and that any further prosecution of the Third Party Actions, prior to the completion of the Trustee's Mendelow Action, would seriously impair and potentially defeat this Court's ability to administer the BLMIS proceedings.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Third Party Plaintiffs:

*i*      declaring that the Third Party Actions violate the automatic stay provisions under 11 U.S.C. § 362(a) and section 78eee(b)(2)(B)(i) of SIPA and the Stay Orders and are therefore void *ab initio*;

*ii*        preliminarily enjoining, pursuant to section 105(a) of the Bankruptcy Code, the Third Party Plaintiffs, and those acting in concert or participation with them or on their behalf, from further pursuing the Third Party Actions, as against Mendelow, or any other actions as against the Mendelow Defendants, until such time as the Trustee has completed the Trustee's Mendelow Action; and

*iii*       granting the Trustee such other relief as the Court deems just and proper.

Dated: New York, New York
       February 23, 2012

           __/s/ Keith R. Murphy_____
           Baker & Hostetler LLP
           45 Rockefeller Plaza
           New York, New York 10111
           Telephone: (212) 589-4200
           Facsimile: (212) 589-4201
           David J. Sheehan
           Email: dsheehan@bakerlaw.com
           Deborah H. Renner
           Email:  drenner@bakerlaw.com
           Keith R. Murphy
           Email: kmurphy@bakerlaw.com
           Geraldine Ponto
           Email: gponto@bakerlaw.com
           Jonathan B. New
           Email: jnew@bakerlaw.com
           Robertson D. Beckerlegge
           Email: rbeckerlegge@bakerlaw.com
           Essence Liburd
           Email: eliburd@bakerlaw.com
           Amy E. Vanderwal
           Email: avanderwal@bakerlaw.com
           Matthew J. Moody
           Email: mmoody@bakerlaw.com

           *Attorneys for Irving H. Picard, Trustee for the*
           *Substantively Consolidated SIPA Liquidation*
           *of Bernard L. Madoff Investment Securities*
           *LLC* and *Bernard L. Madoff*