**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. _____ |
| v. | |
| LARRY WARSHAW AND CAROL WARSHAW AS TRUSTEES FOR CAROL ANN ENTERPRISES, INC. PENSION PLAN, SAJUST, LLC, and MARK D. WEINBERG, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S APPLICATION FOR ENFORCEMENT OF AUTOMATIC STAY AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 4

    A.    The SIPA Trustee's Authority ................................................. 5

    B.    The Court-Ordered Claims Administration Process ................................. 5

    C.    The Net Equity Decision.......................................................... 6

    D.    The Trustee's Proceedings Against Mendelow and FGLS...................... 8

        1.    *Picard v. Mendelow* ...................................................... 8

        2.    *Picard v. FGLS Equity, LLC* ...................................... 10

    E.    The Third Party Actions Seek Customer Property From Mendelow....... 11

        1.    Allegations and Procedural History ........................................... 11

            a.    *Warshaw v. Mendelow*, Index No. 652173/2010 (Sup. Ct. N.Y. Co., filed Dec. 3, 2010)............................ 11

            b.    *Mark. D. Weinberg v. Steven Mendelow, Konigsberg, Wolf & Co., and Paul Konigsberg*, Index No. 652222/2010 (Sup. Ct. N.Y. Co., filed Dec. 9, 2010)................................................... 14

    F.    Mendelow's Motion for Enforcement of the Automatic Stay and for a Preliminary Injunction................................................. 16

    G.    The Third Party Plaintiffs Filed Claims with the Trustee........................ 17

    H.    The Third Party Actions' Allegations Mimic the Allegations in the Trustee's Mendelow Complaint................................................. 18

ARGUMENT ........................................................................................................ 20

    I.    THIS COURT HAS JURISDICTION OVER THE THIRD PARTY ACTIONS AND THIRD PARTY PLAINTIFFS ................................. 20

        A.    This Court Has Subject Matter Jurisdiction Over All of the Third Party Actions and Personal Jurisdiction Over the Third Party Plaintiffs ................................................................. 20

    II.    THE THIRD PARTY ACTIONS VIOLATE THE EXISTING STAYS AND SHOULD OTHERWISE BE PRELIMINARILY ENJOINED ................ 22

        A.    The Third Party Actions Violate the Stay Orders and Automatic Stay ................................................................. 22

            1.    The Automatic Stay Applies...................................... 23

            2.    The Stay Orders Apply ........................................... 24

        B.    The Third Party Plaintiffs Seek the Recovery of Fraudulent Transfers Made to Mendelow in Violation of Section 362(a)(1) ........... 25

C.    The Third Party Plaintiffs Seek to Collect or Recover on the Trustee's Claims in Violation of Section 362(a)(6) ................................ 27

D.    The Third Party Actions Seek to Obtain Customer Property in Violation of Section 362(a)(3) ................................................................ 29

E.    The Third Party Plaintiffs' Aiding And Abetting Fraud Claims Are Based on a Generalized Injury Common to All Creditors that Can Only be Brought By the Trustee ............................................................. 31

III.    THE COURT SHOULD ENJOIN THE THIRD PARTY PLAINTIFFS PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE TO ALLOW FOR THE FAIR AND EQUITABLE ADMINISTRATION OF THE BLMIS ESTATE ......................................................................... 33

A.    Standards for a Section 105(a) Injunction ............................................... 33

B.    The Third Party Actions Threaten the Court's Jurisdiction and the Administration of the Estate and an Injunction is Necessary to Preserve  and Protect the Estate ............................................................. 35

C.    The Third Party Actions Threaten to Undermine the Claims Administration Process ........................................................................... 40

D.    The Trustee Would Pursue Any Transfers of Customer Property From the Mendelow Defendants to the Third Party Plaintiffs ................. 40

CONCLUSION ................................................................................................................. 42

# TABLE OF AUTHORITIES

CASES

*In re 1031 Tax Group, LLC*,
   397 B.R. 670 (Bankr. S.D.N.Y. 2008) .............................................................................31, 35

*48th Street Steakhouse, Inc. v. Rockefeller Group, Inc.* (*In re 48th Street Steakhouse, Inc.*),
   835 F.2d 427 (2d Cir. 1987) .......................................................................................30

*In re Adelphia Commc'ns Corp.*,
   298 B.R. 49 (S.D.N.Y. 2003) .......................................................................................34

*Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp.)*,
   2006 WL 1529357 (Bankr. S.D.N.Y. June 5, 2006) ........................................................ *passim*

*In re Ambac Financial Group, Inc.*,
   457 B.R. 299 (Bankr. S.D.N.Y. 2011) ...................................................................22

*In re AP Indus., Inc.*,
   117 B.R. 798 (Bankr. S.D.N.Y. 1990) ..................................................................... *passim*

*Baldwin-United Corp. v. Paine Webber Group, Inc.* (*In re Baldwin-United Corp.*),
   57 B.R. 759 (S.D. Ohio 1985) .......................................................................................36

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229 (2d Cir. 2011) ...................................................................................7, 8

*In re Burgess*,
   234 B.R. 793 (D. Nev. 1999) .......................................................................................24

*C & J Clark Am., Inc. v. Carol Ruth, Inc.* (*In re Wingspread Corp.*),
   92 B.R. 87 (Bankr. S.D.N.Y. 1988) ...............................................................................34

*In re Calpine Corp.*,
   354 B.R. 45 (Bankr. S.D.N.Y. 2006), *aff'd*, 365 B.R. 401 (S.D.N.Y. 2007) .........................33

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995) .......................................................................................21

*City of New York v. Exxon Corp.*,
   932 F.2d 1020 (2d Cir. 1991) .......................................................................................39

*Crysen/Montenay Energy Co. v. Esselen Assocs. Inc.* (*In re Crysen/Montenay Energy Co.*),
   902 F.2d 1098 (2d Cir. 1990) .......................................................................................25

*FDIC v. Hirsch (In re Colonial Realty Co.)*,
  980 F.2d 125 (2d Cir. 1992) ............................................................................23, 25

*Fisher v. Apostolou*,
  155 F.3d 876 (7th Cir. 1998) ............................................................................ *passim*

*Garrity v. Leffler (In re Neuman)*,
  71 B.R. 567 (S.D.N.Y. 1987) ..........................................................................34

*In re HSM Kennewick, L.P.*,
  347 B.R. 569 (Bankr. N.D. Tex. 2006) ...........................................................24

*In re Ionosphere Clubs, Inc.*,
  111 B.R. 423 (Bankr. S.D.N.Y. 1990), *aff'd in part*, 124 B.R. 635 (S.D.N.Y. 1991) .............34

*Jackson v. Novak (In re Jackson)*,
  593 F.3d 171 (2d Cir. 2010) ............................................................................30

*In re Johns-Manville Corp.*,
  91 B.R. 225 (Bankr. S.D.N.Y. 1988) ...............................................................35

*In re Keene Corp.*,
  162 B.R. 935 (Bankr. S.D.N.Y. 1994) .............................................................34

*Keene Corp v. Coleman (In re Keene Corp.)*,
  164 B.R. 844 (Bankr. S.D.N.Y. 1994) ............................................................ *passim*

*Keller v. Blinder (In re Blinder Robinson & Co.)*,
  135 B.R. 892 (D. Col. 1991) ............................................................................22

*In re Klein, Maus & Shire, Inc.*,
  301 B.R. 408 (Bankr. S.D.N.Y. 2003) .............................................................29

*Koch Ref. v. Farmers Union Cent. Exch., Inc.*,
  831 F.2d 1339 (7th Cir. 1987) .........................................................................31

*Langenkamp v. Culp*,
  498 U.S. 42 (1990) ...........................................................................................22

*Liberty Mut. Ins. Co. v. Off. Unsecured Creditors' Comm. of Spaulding Composite Co.,
  Inc. (In re Spaulding Composites Co., Inc.)*,
  207 B.R. 899 (9th Cir. BAP 1997) ..................................................................23

*LTV Corp. v. Back (In re Chateaugay Corp.)*,
  201 B.R. 48 (Bankr. S.D.N.Y. 1996), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997) ...............21

*LTV Steel Co., Inc. v. Bd. of Educ.* (*In re Chateaugay Corp.*),
    93 B.R. 26 (S.D.N.Y. 1988) ...................................................................................34

*In re Lyondell Chem. Co.*,
    402 B.R. 571 (Bankr. S.D.N.Y. 2009) ...................................................................34

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) ....................................................................................21

*In re MCEG Prods., Inc.*,
    133 B.R. 232 (Bankr. C.D. Cal. 1991) ...................................................................29

*Nevada Power Co. v. Calpine Corp.* (*In re Calpine Corp.*),
    365 B.R. 401 (S.D.N.Y. 2007) ..............................................................................34

*Picard v. Fox*,
    429 B.R. 423 (Bankr. S.D.N.Y. 2010) ........................................................... *passim*

*Picard v. Madoff*,
    11-Misc.-0379 (WHP) (S.D.N.Y.) ........................................................................21

*Picard v. Stahl*,
    443 B.R. 295 (Bankr. S.D.N.Y. 2011), *aff'd* Summary Order, *Fairfield Ret. Program
    v. Picard*, 11-CV-2392, ECF No. 26 (Dec. 5, 2011) ...................................... *passim*

*In re Probulk Inc.*,
    407 B.R. 56 (Bankr. S.D.N.Y. 2009) .....................................................................33

*Publicker Indus. Inc. v. U.S.* (*In re Cuyahoga Equip. Corp.*),
    980 F.2d 110 (2d Cir. 1992) ..................................................................................20

*Queenie, Ltd. v. Nygard Int'l*,
    321 F.3d 282 (2d Cir. 2003) ...........................................................................34, 36

*In re Rubin*,
    160 B.R. 269 (Bankr. S.D.N.Y. 1993) ...................................................................39

*In re Russo*,
    18 B.R. 257 (Bankr. E.D.N.Y. 1982) .....................................................................39

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff
    Inv. Sec. LLC*),
    424 B.R. 122 (Bankr. S.D.N.Y. 2010), *aff'd,* 654 F.3d 229 (2d Cir. 2011) ................... *passim*

*Sec. Investor Prot. Corp. v. Blinder, Robinson & Co., Inc.,*
    962 F.2d 960 (10th Cir. 1992) ................................................................39

*SEC v. Bernard L. Madoff,*
    08-CIV-10791 (LLS), ECF No. 4 ..........................................................24

*In re Shea & Gould,*
    214 B.R. 739 (Bankr. S.D.N.Y. 1997)....................................................39

*In re Singer Co. N.V.,*
    2000 WL 33716976 (Bankr. S.D.N.Y. Nov. 3, 2000) ......................35, 39

*Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.),*
    108 F.3d 881 (8th Cir. 1997) ..................................................................27

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,*
    884 F.2d 688 (2d Cir. 1989)....................................................................31

*Stern v. Marshall,*
    -- U.S. --, 131 S. Ct. 2594 (2011) ...............................................20, 21, 22

*In re Teleservices Group, Inc.,*
    456 B.R. 318 (Bankr. W.D. Mich. 2011).................................................21

*United States v. Madoff,*
    Case No. 09-CR-213(DC) (S.D.N.Y. Mar. 12, 2010) ............................29

**STATUTES**

11 U.S.C. § 101(15)........................................................................................22

11 U.S.C. §§ 101 *et seq.*..................................................................................1

11 U.S.C. § 105........................................................................................34, 38

11 U.S.C. § 105(a) .................................................................................. *passim*

11 U.S.C. § 362........................................................................................34, 38

11 U.S.C. § 362(a) ................................................................................... *passim*

11 U.S.C. § 362(a)(1)......................................................................23, 25, 32

11 U.S.C. § 362(a)(3)......................................................................23, 29, 30

11 U.S.C. § 362(a)(6)......................................................................23, 27, 28

11 U.S.C. § 541 ...................................................................................................21

11 U.S.C. § 544 .....................................................................................................8

11 U.S.C. § 548 ...................................................................................................41

11 U.S.C. § 548(a) .................................................................................................8

11 U.S.C. § 549 ...................................................................................................41

11 U.S.C. § 550 ...................................................................................................41

11 U.S.C. § 550(a) .................................................................................................8

11 U.S.C. § 551 .....................................................................................................8

15 U.S.C. §§ 78aaa *et seq.* ...................................................................................1

15 U.S.C. § 78eee(a)(3) ....................................................................................1, 23

15 U.S.C. § 78eee(b)(1) .......................................................................................29

15 U.S.C. § 78eee(b)(2)(B) ........................................................................1, 23, 42

15 U.S.C. § 78eee(b)(4) .......................................................................................20

15 U.S.C. § 78fff-1(a) .........................................................................................5, 8

15 U.S.C. § 78fff-2(a)(3) .......................................................................................6

15 U.S.C. § 78fff-2(c)(3) ...................................................................................8, 29

15 U.S.C. § 78fff(b) .......................................................................................5, 8, 33

15 U.S.C. § 78*lll*(4) .........................................................................................5, 29

15 U.S.C. § 78*lll*(11) ...........................................................................................6

28 U.S.C. § 157(b)(1) ..........................................................................................20

28 U.S.C. § 157(b)(2)(A) .....................................................................................20

28 U.S.C. § 157(b)(2)(B) .....................................................................................20

28 U.S.C. § 157(b)(2)(G) .....................................................................................22

28 U.S.C. § 1334 ...................................................................................................21

28 U.S.C. § 1334(b) ..............................................................................................20

N.Y. Debt. & Cred. § 270 *et seq*. ........................................................................8

**RULES**

NY CPLR 203(g) ....................................................................................................8

NY CPLR 213(8) ....................................................................................................8

Fed. R. Bankr. P. 7065 ..........................................................................................33

**OTHER AUTHORITIES**

COLLIER ON BANKRUPTCY ¶ 362.03(8)(c) (Alan A. Resnick & Henry J. Sommer eds., 16th ed. (2010) .............................................................................................27

H.R. REP. NO. 1613, 91st Cong. 2d Sess. (1970) *reprinted in* 1970 U.S.C.C.A.N. 5254 ..............39

H.R. REP. NO. 595, 95th Cong., 1st Sess. 340 (1977) ..........................................24

S. REP. NO. 989, 95th Cong. 2d Sess. 49 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 .............24

Irving H. Picard, as trustee (the "Trustee") for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA") and the estate of Bernard L. Madoff, individually ("Madoff"), by and through his undersigned counsel, respectfully submits this memorandum of law in support of his application pursuant to sections 362(a) and 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and SIPA §§ 78eee(a)(3) and 78eee(b)(2)(B) to: (a) enforce the December 15, 2008 stay order and related orders (the "Stay Orders") of the United States District Court for the Southern District of New York (the "District Court") and the automatic stay in this proceeding; (b) declare that the competing actions brought by (i) Larry Warshaw and Carol Warshaw, as trustees for Carol Ann Enterprises, Inc. Pension Plan and Sajust, LLC; and (ii) Mark D. Weinberg (the "Third Party Plaintiffs"), filed in the Supreme Court of the State of New York (collectively, the "Third Party Actions"), against Stephen B. Mendelow, who, together with related entities and individuals, is named in an action commenced by the Trustee, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (BRL) (Bankr. S.D.N.Y., filed November 24, 2010) (the "Trustee's Mendelow Action" and all of the defendants named therein, the "Mendelow Defendants"),[1] violate the Stay Orders and the automatic stay and are void *ab initio* as against Mendelow; and (c) preliminarily enjoin the Third Party Plaintiffs from litigating the Third Party Actions as against Mendelow or any other actions as against the Mendelow Defendants, pending the completion of the Trustee's Mendelow Action.

## PRELIMINARY STATEMENT

In connection with his efforts to collect billions of dollars of stolen customer property, the Trustee filed his complaint on November 23, 2010 against the Mendelow Defendants, who

---

[1] The Trustee reserves the right to seek similar relief with respect to any third party suits against any of the Mendelow Defendants.

collectively received more than $20 million in transfers from BLMIS, of which over $11.4 million was fictitious profit, money stolen from other BLMIS customers. The Trustee's efforts to recoup these transfers are being hampered by the Third Party Actions which, if successful, would allow the Third Party Plaintiffs to circumvent the claims process and jump ahead of other customers, reducing the amount recoverable by the Trustee for the benefit of all those defrauded by Madoff. As the District Court held in affirming this Court's ruling in a similar case:

> [R]ather than have a profusion of claims, it's the rationale behind Section 362 and Section 105 to favor the trustee. It doesn't have to be for all time, but it has to allow the trustee the ability to pursue his actions and obtain rulings and finality on those rulings because the trustee is acting for the benefit of all creditors and not just a few.

(Declaration of Jonathan B. New, dated February 23, 2010 (the "New Decl."), Ex. C (transcript of District Court hearing in *Picard v. Stahl*, 11-CV-2392) at 31:16-21.)) The Trustee's action against the Mendelow Defendants is for the benefit of all creditors and not the few purported creditors represented in the Third Party Actions.

As the Trustee pleads, Mendelow, a principal of the accounting firm Konigsberg Wolf & Co., P.C. ("KW") for more than 25 years, had a long-standing relationship with Madoff. (Complaint ¶ 2, *Picard v. Mendelow*, Adv. Pro. No. 10-04283 (BRL) (Bankr. S.D.N.Y., Nov. 24, 2010).) In the late 1980s and early 1990s, Mendelow funneled customers' money into BLMIS through the accounting firm operated by Frank Avellino and Michael Bienes ("A&B"). (*Id.* ¶ 4.) Mendelow made a significant profit from the spread between the return given to his investors and the profit guaranteed to A&B by BLMIS. In 1993, the United States Securities and Exchange Commission ("SEC") shut down this operation because of Mendelow's sale of unlicensed securities. (*Id.* ¶ 5.) Although Mendelow was forced to return the money to investors, the majority of that money was reinvested with BLMIS under a new arrangement between Mendelow and Madoff, whereby Mendelow was compensated directly by BLMIS

through fraudulent side payments and returns at a guaranteed rate. (*Id.*) Through these methods, Mendelow, his family, and related entities withdrew or received as illegal side payments and guaranteed returns more than $20 million from BLMIS, of which $11.4 million consisted fictitious profits, *i.e.*, other people's money. (*Id.* ¶ 8.) As the Trustee will prove in his action, substantially all of Mendelow's recoverable assets consist of millions of dollars of other customers' money withdrawn from BLMIS. As to all Mendelow Defendants, information available to the Trustee shows that their collective recoverable assets may be insufficient to satisfy the Trustee's claims.[2] (New Decl. ¶ 5.)

There are currently two Third Party Actions pending against Mendelow.[3] In January 2011, Mendelow filed a motion attempting to enforce the automatic stay and enjoin one of these actions.[4] (New Decl., Exs. E, F.) The Trustee objected to this motion on the grounds that only the Trustee could seek such relief and that the Trustee did not believe that it was appropriate to do so at that time, reserving his right to do so at the proper juncture. (New Decl., Ex. G.) Since the filing of Mendelow's motion, the Trustee's investigation has continued and he has now determined that the relief requested herein is necessary to protect the BLMIS estate.

Each of the Third Party Actions asserts claims belonging to the Trustee. And, to the extent that there may be causes of action that do not belong to the Trustee, each violates the automatic stay because the Third Party Plaintiffs seek recovery of the <u>same</u> funds sought by the

---

[2] On information and belief, Mendelow may have significant assets held in one or more retirement accounts that may not be recoverable in the Trustee's Mendelow Action. (New Decl. ¶ 4.)

[3] The Third Party Actions are: *Larry Warshaw and Carol Warshaw as Trustees for Carol Ann Enterprises, Inc. Pension Plan, and Sajust, LLC v. Steven Mendelow, Konigsberg, Wolf & Co., and Paul Konigsberg*, Index No. 652173/2010 (Sup. Ct. N.Y. Co. filed Dec. 3, 2010) and *Mark. D. Weinberg v. Steven Mendelow, Konigsberg, Wolf & Co., and Paul Konigsberg*, Index No. 652222/2010 (Sup. Ct. N.Y. Co. filed Dec. 9, 2010). For the Court's reference, the complaints in the respective Third Party Actions are attached as Exhibits A and B to the New Declaration.

[4] Subsequent to the filing of Mendelow's motion, a complaint was filed by Mark D. Weinberg ("Weinberg) seeking similar relief. Thus, the Trustee includes the Weinberg action herein.

Trustee, based on the <u>same</u> operative facts and against the <u>same</u> defendants as the Trustee's Mendelow Action. The Third Party Plaintiffs are attempting to recover on the Trustee's fraudulent transfer claims against the Mendelow Defendants. As they concede in their Complaints, the losses alleged by the Third Party Plaintiffs were the loss of funds that were invested in BLMIS and then wrongly transferred from BLMIS to the Mendelow Defendants. All of these funds were customer property because, as the Third Party Plaintiffs also concede, these funds were derived from the BLMIS Ponzi scheme. They therefore seek to control or interfere with property of the estate, or to collect on claims against the debtor, in violation of section 362(a).

Moreover, the Third Party Actions are so closely related to the Trustee's claims that to permit the Third Party Actions to proceed to a judgment would threaten to deplete potential estate assets, interfere with the administration of the estate, upend SIPA's equitable distribution scheme, derail the bankruptcy proceeding and create a race to the courthouse. Finally, FGLS Equity LLC, the entity through which the Third Party Plaintiffs invested in BLMIS, has filed a claim in the liquidation. The Third Party Plaintiffs should not be permitted to circumvent the claims process in an attempt to obtain more for themselves at the expense of other investors.

Accordingly, the Trustee seeks to enforce the automatic stay and Stay Orders, and to otherwise preliminarily enjoin the Third Party Plaintiffs from proceeding.

## STATEMENT OF FACTS

The facts and procedural history relevant to the Madoff Ponzi scheme have been set forth numerous times and need not be repeated here.[5]

---

[5] *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 125-33 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011); *Picard v. Fox*, 429 B.R. 423, 426 (Bankr. S.D.N.Y. 2010).

## A.      The SIPA Trustee's Authority

Under SIPA, the Trustee is charged with recovering and distributing customer property[6] to BLMIS's customers, assessing claims and liquidating any other assets of the firm for the benefit of the estate and its creditors.  Pursuant to section 78fff-1(a) of SIPA, the Trustee has the general powers of a bankruptcy trustee in addition to the powers granted by SIPA.[7]

The Trustee has thus far recovered or entered into agreements to recover more than $8.7 billion for victims of the Madoff Ponzi scheme.  (Trustee's Sixth Interim Report ¶ 16, *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec.*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. Nov. 15, 2011), ECF No. 4529.)  The Trustee's recovery process includes identifying those individuals and entities who received avoidable transfers from BLMIS and recovering these moneys for *pro rata* distribution to customers in accordance with SIPA.

## B.      The Court-Ordered Claims Administration Process[8]

The Trustee sought and obtained an order from this Court to implement a customer claims process in accordance with SIPA (the "Claims Procedures Order"), which required*, inter alia*, that certain notice be given.[9]

---

[6] Under section 78*lll*(4) of SIPA, "customer property" is defined as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

[7] Further, pursuant to section 78fff(b) of SIPA, chapters 1, 3, 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code are applicable to this case.

[8] The facts in this section are drawn from the Trustee's Third Interim Report.  (Trustee's Amended Third Interim Report, *Sec. Investor Prot. Corp.*, Adv. Pro. No. 08-01789, (Bankr. S.D.N.Y. April 14, 2010), ECF No. 2207.)

[9] Pursuant to an application of the Trustee dated December 21, 2008 (*Sec. Investor Prot. Corp.*, Adv. Pro. No. 08-01789, ECF No. 8), this Court entered the Claims Procedures Order (*id.*, ECF No. 12), which directed, among other things, that on or before January 9, 2009: (a) a notice of the commencement of this SIPA proceeding be published; (b) notice of the liquidation proceeding and claims procedure be given to persons who appear to have been customers of BLMIS; and (c) notice of the liquidation proceeding and a claim form be mailed to all known general creditors of the debtors.  More than 16,000 potential customer, general creditor and broker-dealer claimants were included in the mailing of the notice.  The Trustee published the notice in all editions of *The New York Times*, *The Wall Street Journal*, *The Financial Times*, *USA Today*, *Jerusalem Post*, and *Ye-diot Achronot* and posted claim forms and claims filing information on the Trustee's website and SIPC's website.

Under the Claims Procedures Order, claimants were directed to mail their claims to the Trustee. All customers and creditors were notified of the mandatory statutory bar date for filing of claims under section 78fff-2(a)(3) of SIPA, which was July 2, 2009 (the "Bar Date"). The Trustee also provided several reminder notices.[10] By the Bar Date, the Trustee had received 16,239 customer claims. In accordance with the Claims Procedures Order, the Trustee has developed a comprehensive claims administration process for the intake, reconciliation, and resolution of these customer claims.

### C. The Net Equity Decision

The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that customers share *pro rata* in customer property to the extent of their net equity, as defined in section 78*lll*(11) of SIPA. The Securities Investor Protection Corporation ("SIPC") advances funds to the trustee for a customer with a valid net equity claim, up to the amount of their net equity, if their ratable share of customer property is insufficient to make them whole. Such advances are capped at $500,000 per customer.

The Trustee determined each customer's "net equity" by crediting the amount of cash deposited by the customer into her BLMIS account, less any amounts withdrawn from her BLMIS customer account, otherwise known as the "Net Investment Method." After certain claimants objected to the Trustee's interpretation of net equity, the Trustee moved for a briefing schedule and hearing on the matter. On March 1, 2010, the Bankruptcy Court issued its decision on the Net Equity issue, approving the Trustee's method of determining net equity (the "Net

---

[10] On May 21, 2009, the Trustee mailed a reminder notice to customers who had not yet filed a claim that the statutory bar date was July 2, 2009. On June 22, 2009, the Trustee mailed a final bar date reminder notice (the "Final Reminder Notice") to 7,766 known past and present customers of BLMIS from whom a claim had not yet been received. In addition, the Trustee posted the Final Reminder Notice on the Trustee's website.

Equity Decision"). *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Bernard L. Madoff Sec., LLC)*, 424 B.R. 122 (Bankr. S.D.N.Y. 2010):

> Because 'securities positions' are in fact nonexistent, the Trustee cannot discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be. Rather, the only verifiable amounts that are manifest from the books and records are the cash deposits and withdrawals.

*Id.* at 135.

The Bankruptcy Court also concluded that the Trustee's calculation of net equity was consistent with the avoidance powers available to him under SIPA and the Bankruptcy Code. *Id.* at 135-38, and that both equity and practicality favor utilizing the Trustee's calculus:

> Customer property consists of a limited amount of funds that are available for distribution. Any dollar paid to reimburse a fictitious profit is a dollar no longer available to pay claims for money actually invested. If the Last Statement Method were adopted, Net Winners would receive more favorable treatment by profiting from the principal investments of Net Losers, yielding an inequitable result.
>
> * * *
>
> Equality is achieved in this case by employing the Trustee's method, which looks solely to deposits and withdrawals that in reality occurred.

*Id.* at 141-42.

On March 8, 2010, the Bankruptcy Court issued an order approving the Trustee's Net Equity calculation ("Net Equity Order") and certified an appeal of the Net Equity Order directly to the United States Court for the Second Circuit Court of Appeals. (Net Equity Order, *Sec. Investor Prot. Corp.*, Adv. Pro. No. 08-01789, ECF No. 2020; Certification of Net Equity Order, *Id.*, ECF No. 2022.) On August 16, 2011, the Second Circuit affirmed the Net Equity Decision. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011). The Circuit found that

> [I]f the Trustee had permitted the objecting claimants to recover based on their final account statements, this would have 'affect[ed] the limited amount available for distribution from the customer property fund.' [Citing *In re Bernard L. Madoff Sec., LLC*, 424 B.R. at 133.] The inequitable consequence of such a scheme

would be that those who had already withdrawn cash deriving from imaginary profits in excess of their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed.

*In re Bernard L. Madoff*, 654 F.3d at 238.

### D. The Trustee's Proceedings Against Mendelow and FGLS

#### 1. *Picard v. Mendelow*

On November 23, 2010, the Trustee commenced his Mendelow Action. In his complaint (the "Trustee's Mendelow Complaint"), the Trustee seeks the return of $20,250,720 in principal and fictitious profits under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3), sections 105(a), 544, 548(a), 550(a) and 551 of the Bankruptcy Code, N.Y. Debt. & Cred. Law § 270 *et seq*., NY CPLR 203(g) and 213(8), and other applicable law, for fraudulent and subsequent transfers in connection with certain transfers of property by BLMIS to or for the benefit of the defendants. By his action, the Trustee seeks to set aside the transfers to the Mendelow Defendants and preserve the property for the benefit of the defrauded customers of BLMIS. (Tr. Mendelow Compl. ¶ 12.)

The Trustee alleges that Mendelow was a beneficiary of the BLMIS Ponzi scheme for almost twenty years, dating back to at least the 1980s when he operated Telfran Associates Ltd. ("Telfran"). (*Id*. ¶ 3.) The Trustee alleges that from 1989 until 1992, using Telfran, Mendelow funneled money from investors to BLMIS through the accounting firm A&B. (*Id*. ¶¶ 3-4.) Mendelow profited from the spread between the guaranteed rates of return provided to Telfran investors and the guaranteed rates of return provided to A&B investors. (*Id*. ¶ 4.) In 1993, Mendelow and Telfran were fined and permanently enjoined by the SEC from selling unregistered securities and Telfran was forced to return money to investors. (*Id*. ¶ 5.)

The SEC's injunction as to Telfran did not stop Mendelow from profiting from BLMIS. Under a new arrangement between Madoff and Mendelow, Mendelow was compensated directly for money he steered to BLMIS through fraudulent side payments (an annual payment made to Mendelow for referring former Telfran investors to BLMIS). (*Id.*) The majority of the money BLMIS returned to the Telfran investors was reinvested under this new scheme. (*Id.*) The Trustee has alleged that these fraudulent side payments totaled in excess of $5.1 million between 1993 and 2007. (*Id.* ¶ 87.) From at least 1993 to 1996, Mendelow also received a guaranteed rate of return of 17% on his investments with BLMIS. (*Id.* ¶ 88.)

The Trustee alleges that the Mendelow Defendants knew or should have known that they were benefiting from manipulated returns and that BLMIS was engaged in fraud based on a number of indicia of fraud, including the guaranteed rate of return and the patterns of returns in various accounts. Mendelow closely tracked his fraudulent side payments and guaranteed rate of return and was able to direct the value of his accounts based upon his calculations of these amounts. (*Id.* ¶¶ 93-96.) The Trustee alleges that, among other things, the guaranteed rate of return should have put the Mendelow Defendants on inquiry notice that Madoff was engaged in fraudulent trading practices. (*Id.* ¶ 89.) From at least 1993 to 2007, BLMIS reported implausibly consistent, and consistently high, rates of return for the Mendelow Defendants' accounts—in some instances as high as 43%, 34.7%, and 28.7%—while other of their accounts invested in the same purported strategy received returns that were less than half those amounts, ranging from no greater than 10.4% to 14.5% over the same period. (*Id.* ¶¶ 10, 89.) It was not plausible that a single investment firm could simultaneously achieve such different results while purportedly using the same strategy, results which permitted the Mendelow Defendants to collectively withdraw more than $20 million from BLMIS. (*Id.*)

Mendelow received the benefit of other customers' property in the form of fictitious profits and payments from a number of different BLMIS accounts. Not only did he have his own investment account, but he controlled that of his wife, Nancy, as well as the accounts of multiple entities. In addition to Mendelow's and Nancy Mendelow's investment accounts (both of which received the fraudulent side payments and a guaranteed rate of return), the Trustee believes Mendelow was a subsequent transferee of BLMIS accounts held in the name of FGLS Equity LLC ("FGLS") and C&P Associates (which also received fraudulent side payments and a guaranteed rate of return). The Trustee has alleged that over the life of the accounts, the Mendelow Defendants received transfers of $11,435,809 of other people's money. (*Id.* ¶¶ 8, 49, 106.)

Based on Mendelow's status as someone with actual or at least inquiry notice of the fraudulent practices of BLMIS, the Trustee is also seeking $8,814,911 in the return of principal. (*Id.* ¶ 106.) In total, the Trustee is seeking more than $20 million from the Mendelow Defendants. This is a substantial sum of money and the Trustee has serious concerns about his ability to collect the full amount of such a judgment from Mendelow, his family and his affiliated entities.

On October 27, 2011 the Mendelow Defendants filed a motion to withdraw the reference to the Bankruptcy Court. (*Id.*, ECF No. 31.) This motion is currently pending before the Honorable J. Rakoff in the District Court for the Southern District of New York. (*Picard v. Mendelow*, Adv. Pro. No. 11-07680 (S.D.N.Y., filed Oct. 28, 2011).

### 2. *Picard v. FGLS Equity, LLC*

In a separate action, the Trustee filed a complaint against FGLS for avoidance of preferential transfers (the "Trustee's FGLS Action"). *Picard v. FGLS Equity, LLC*, Adv. Pro. No. 10-05191 (Bankr. S.D.N.Y. filed Dec. 3, 2010). In the Trustee's Complaint (the "Trustee's

FGLS Complaint"), the Trustee alleges that FGLS was an investment vehicle operated by Mendelow through which he invested other people's money in BLMIS and from which Mendelow received subsequent transfers. (New Decl., Ex. J., Tr. FGLS Compl. ¶ 9.) FGLS filed an answer to the complaint on May 26, 2011. (Adv. Pro. No. 10-05191, ECF No. 7). FGLS filed a motion to withdraw the reference to the Bankruptcy Court, which is currently pending before the Honorable J. Rakoff in the District Court for the Southern District of New York. *Picard v. FGLS Equity LLC*, Adv. Pro. No. 12-00208 (S.D.N.Y., filed Jan. 11, 2012).

**E.    The Third Party Actions Seek Customer Property From Mendelow**

There are currently two Third Party Actions known to the Trustee to be pending against Mendelow that seek customer property in the guise of damages. At this time, the Trustee seeks an injunction only as to the Mendelow Defendants, not as to other defendants named in the Third Party Actions. As detailed below, the Third Party Plaintiffs are investors in FGLS. Each of the Third Party Actions seeks to recover funds that Mendelow allegedly received in connection with the BLMIS fraud. Each of the Third Party Actions is based on the same facts alleged in the Trustee's Complaint, although they further allege misrepresentations or other conduct by Mendelow directed specifically toward the Third Party Plaintiffs. These further allegations do not change the fact that the Third Party Plaintiffs are improperly attempting to leap in front of other estate creditors to obtain a larger share of customer property from the estate than they would otherwise recover.

**1.    Allegations and Procedural History**

**a.    *Warshaw v. Mendelow,* Index No. 652173/2010
(Sup. Ct. N.Y. Co., filed Dec. 3, 2010)**

On or about December 3, 2010, Larry Warshaw and Carol Warshaw, as Trustees for Carol Ann Enterprises, Inc. Pension Plan (the "Pension Plan") and Sajust, LLC ("Sajust" and

collectively with the Pension Plan, the "Warshaw Plaintiffs") commenced a derivative action in the Supreme Court of New York (the "New York Supreme Court") against Mendelow, KW, and Paul Koningsberg ("Koningsberg"). *Warshaw v. Mendelow*, Index No. 652173/2010 (Sup. Ct. N.Y. Co. filed Dec. 3, 2010). Plaintiffs filed an amended complaint on February 17, 2010 (the "Warshaw Complaint"). (New Decl., Ex. A.)

Per the Warshaw Complaint, Mendelow furnished tax, accounting, and investment services to Larry Warshaw ("Warshaw") and several of Warshaw's family-owned businesses through Mendelow's employment at KW. (*Id.*, Warshaw Compl. ¶ 7.) On Mendelow's advice, Warshaw and several of his relatives formed Sajust for the purpose of investing in FGLS. (*Id.* ¶ 8.) The Pension Plan, an employees' pension trust for a business owned by Warshaw and his brother, was also invested in FGLS. (*Id.*) The Trustees for the Pension Plan are Warshaw and Carol Warshaw. (*Id.* ¶ 12.) As against Mendelow, the Warshaw Complaint asserts claims for professional malpractice, breach of fiduciary duty, fraud and conspiracy to defraud, negligent misrepresentation, and aiding and abetting fraud. (*Id.* ¶¶ 82-110.)

The Warshaw Plaintiffs' aiding and abetting fraud claim is based on a generalized injury common to all creditors of BLMIS. As such, and as discussed in detail below, the Warshaw Plaintiffs are specifically precluded from asserting this claim. The remainder of the claims alleged by the Warshaw Plaintiffs similarly cannot proceed because they are nothing more than thinly-veiled attempts to recover funds fraudulently transferred by BLMIS to the Mendelow Defendants. These fraudulent transfer claims belong to the Trustee and any recovery in connection therewith must be for the benefit of all of BLMIS's customers with valid claims.

The Warshaw Plaintiffs seek $2,676,434 to reimburse their principal lost through their investment in FGLS, which was fully invested in BLMIS. (New Decl., Ex. A, Warshaw Compl.

¶ 8.) The Warshaw Plaintiffs' own allegations make clear that the losses they suffered were losses of funds that were invested in BLMIS, and the damages they seek to recover consist of BLMIS customer property wrongly transferred to the Mendelow Defendants:

- "Defendants exploited the trust that Larry Warshaw [] had developed as the result of [Konigsberg Wolf] serving as a long-time financial advisor, tax preparer and accountant for him and several of his family owned businesses [] to fraudulently induce Plaintiffs' investments into FGLS . . . for the purpose of investing with BLMIS." (*Id.* ¶ 7)

- "Upon the advice of KW, as communicated principally by Mendelow, Warshaw and several of his relatives formed Sajust for the purpose of investing in FGLS. Sajust, and Carol Ann Enterprises, Inc. Pension Plan . . . lost a total of $2,676,434 in principal in FGLS." (*Id.* ¶ 8.)

- "The Defendants caused all of FGLS'[s] capital to be invested with BLMIS." (*Id.* ¶ 49.)

- "Defendants substantially aided and abetted BLMIS in defrauding Plaintiffs of $2,676,434." (*Id.* ¶ 108; s*ee also id.* ¶¶ 88, 93, 102, 106 (seeking compensatory damages on each cause of action "believed to be in excess of $2,676,434").)

The Warshaw Plaintiffs further acknowledge that the recoveries that they are seeking constitute funds derived from the BLMIS Ponzi scheme:

- "Before being sanctioned by the SEC, Mendelow earned a percentage of the funds he originated for Madoff. Subsequent to being sanctioned by the SEC, Mendelow demanded and received fraudulent payments from Madoff totaling in excess of $5 million based on the number of investors he solicited to invest with BLMIS. Further, Mendelow arranged for BLMIS accounts to be established for the benefit of himself and his family members which received fixed rates of return ranging from 28% to 43% per year." (*Id.* ¶ 3.)

- "Mendelow extracted from Madoff an agreement to pay him kick-backs based on the amount of money former Telfran clients, or new clients, invested in BLMIS. In sum, Mendelow received in excess of $5 million in fraudulent side payments from Madoff after the filing of the SEC enforcement actions. Moreover, Madoff rewarded Mendelow by providing favorable rates of return, up to 40% per year, on BLMIS accounts established for the benefit of Mendelow and some of his family members." (*Id.* ¶ 33.)

The Warshaw Complaint also makes numerous allegations regarding Mendelow's and Konigsberg's histories with BLMIS, Madoff and the Ponzi scheme, KW's activities, and

Mendelow's alleged inducement of the Warshaw Plaintiffs to invest in FGLS. However, the simple matter is that the Warshaw Plaintiffs invested in FGLS, lost that investment through the collapse of BLMIS, and now want to place themselves ahead of other victims. An end-run around the Trustee's liquidation proceedings should not be permitted. As discussed further below, FGLS has filed a customer claim with the Trustee. The Warshaw Plaintiffs' appropriate method of recovery is not through Mendelow directly but through FGLS's customer claim.

> **b.** ***Mark. D. Weinberg v. Steven Mendelow, Konigsberg, Wolf & Co., and Paul Konigsberg*, Index No. 652222/2010 (Sup. Ct. N.Y. Co., filed Dec. 9, 2010).**

On or about December 9, 2010, Weinberg commenced a derivative action in the New York Supreme Court against Mendelow, KW, and Koningsberg. *Weinberg v. Mendelow*, Index No. 652222/2010 (Sup. Ct. N.Y. Co. filed Dec. 9, 2010). Weinberg filed a complaint in that action on February 17, 2010 (the "Weinberg Complaint"). (New Decl., Ex. B.)

Per the Weinberg Complaint, Mendelow induced Weinberg to personally invest a total of $1,000,000 in FGLS for the purpose of investing in BLMIS in 2003 and 2004. (*Id.*, Weinberg Compl. ¶ 7.) As against Mendelow, the Weinberg Complaint asserts claims for professional malpractice, breach of fiduciary duty, fraud and conspiracy to defraud, negligent misrepresentation, and aiding and abetting fraud. (*Id.* ¶¶ 71-101.)

As is the case with the Warshaw Plaintiffs, Weinberg's aiding and abetting fraud claim is based on a generalized injury common to all creditors of BLMIS. As such, Weinberg is specifically precluded from asserting this claim. The remainder of the claims alleged by Weinberg also cannot proceed because they are attempts to recover funds fraudulently transferred by BLMIS to the Mendelow Defendants. These fraudulent transfer claims belong to the Trustee and any recovery in connection therewith must be for the benefit of all of BLMIS's customers with valid claims.

Weinberg seeks $1,600,000 to reimburse the $1,000,000 in principal and an additional $600,000 in purported profit in connection with his investment in FGLS, which was fully invested in BLMIS. (New Decl., Ex. B, Weinberg Compl. ¶¶ 7, 60.) Weinberg's own allegations make clear that the funds he seeks to recover consist of BLMIS customer property:

- "Mendelow induced Plaintiff to invest personally in FGLS . . . for the purpose of investing with BLMIS. Upon the advice of Mendelow, Plaintiff invested a total of $1,000,000 in FGLS in 2003 and 2004. Plaintiff never withdrew any funds from FGLS and therefore has lost at least $1,000,000." (*Id.* ¶ 7)

- "Defendants caused all of FGLS's capital to be invested with BLMIS." (*Id.* ¶ 38.)

- "In and around 2002 and 2003, KW, through Mendelow, advised Plaintiff to invest in FGLS, which invested in BLMIS directly. Based on this advice, on or around September 9, 2003, Plaintiff invested $500,000 in FGLS, and on or around April 12, 2004, an additional $500,000." (*Id.* ¶ 56.)

- "Defendants advised Plaintiff that as of November 30, 2008, Plaintiff's account was valued in excess of $1,600,000, when, in fact, as a result of the wrongdoing, Plaintiff has likely lost his entire investment as he never withdrew any funds from FGLS." (*Id.* ¶ 60.)

- "Defendants substantially aided and abetted BLMIS and Madoff in defrauding Plaintiff of at least $1,600,000." (*Id.* ¶ 99; *see also id.* ¶¶ 77, 83, 92, 97 (seeking damages for each cause of action of "at least $1,600,000").)

Weinberg's Complaint also makes it clear that the recoveries that he is seeking constitute funds derived from the BLMIS Ponzi scheme:

- "Before being sanctioned by the SEC, Mendelow earned a percentage of the funds he originated for Madoff. Subsequent to being sanctioned by the SEC, Mendelow received payments from Madoff totaling more than $5 million for his solicitation of investors with BLMIS." (*Id.* ¶ 3.)

- "Mendelow, Glantz and A&B shared the spread between the returns A&B received from BLMIS and the returns Telfran promised to its underlying investors. Consequently, Telfran received millions in profits for originating funds for BLMIS." (*Id.* ¶ 20.)

- "Mendelow extracted from Madoff an agreement to pay him kickbacks based on the amount of money former Telfran clients, or new clients, invested in BLMIS. In all, Mendelow received in excess of $5 million in side payments from Madoff after the filing of the SEC enforcement actions. Madoff rewarded Mendelow by

providing favorable rates of return, up to 40% per year, on BLMIS accounts established for the benefit of Mendelow and some of his family members." (*Id.* 22.)

Like the Warshaw Plaintiffs, Weinberg seeks to place himself ahead of other BLMIS victims. As with the Warshaw Plaintiffs, Weinberg's appropriate method of recovery is through FGLS, not Mendelow directly.

### F. Mendelow's Motion for Enforcement of the Automatic Stay and for a Preliminary Injunction

On January 18, 2011, Mendelow filed a Motion for the Enforcement of the Automatic Stay and for a Preliminary Injunction. (New Decl., Exs. E, F.) In that motion, Mendelow requested that the Warshaw Action be stayed and/or enjoined as violative of section 362(a) of the Bankruptcy Code and as infringing the Bankruptcy Court's jurisdiction. (*Id.*, Ex. F) On March 1, 2011, the Trustee filed an opposition to this motion, arguing that the Trustee has the exclusive right to protect the assets of the BLMIS estate by ensuring the enforcement of the automatic stay and the Stay Orders and thus Mendelow lacked standing to do so. (*Id.*, Ex. G.) Although in his opposition the Trustee declined to seek injunctive relief at that time, further investigation has made it apparent that injunctive relief is necessary for the protection of the BLMIS estate. (*See id.* at 8.)

Based on the Trustee's investigation to date, a substantial portion of the assets currently held by Mendelow are ultimately derived from BLMIS. (New Decl. ¶ 3.) Furthermore, the evidence available to the Trustee indicates that the recoverable assets currently held by the Mendelow Defendants may be insufficient to satisfy the Trustee's avoidance claims. (*Id.* ¶ 5.) Significantly, if the Third Party Plaintiffs were to recover any money from Mendelow by way of their actions, the Trustee would bring avoidance actions against them as subsequent transferees of avoidable transfers.

The Warshaw Defendants also opposed Mendelow's motion. (*Id.*, Ex. H.) Mendelow filed a reply memorandum on March 25, 2011. (*Id.*, Ex. I.) On January 24, 2012, a stipulation between the Trustee, the Mendelow Defendants, and the Warshaw Plaintiffs adjourning the hearing on this motion to March 28, 2012 was "so ordered" by this Court. (Adv. Pro. No. 10-04283, ECF No. 36.) The hearing was subsequently re-scheduled by the Court for March 22, 2012, and the briefing schedule was revised accordingly.

### G. The Third Party Plaintiffs Filed Claims with the Trustee

The Third Party Plaintiffs have availed themselves of the Claims Procedures Order and filed claims with the Trustee. (Affidavit of Matthew Cohen in Support of Trustee's Application for Enforcement of Automatic Stay and Preliminary Injunction, dated February 23, 2012 ("Cohen Aff."), Exs. B, D, F.) On or about June 25, 2009, Third Party Plaintiff Pension Plan filed a customer claim with the Trustee with regard to its underlying investments with FGLS that the Trustee has designated as Claim No. 011316. (*Id.*, Ex. B.) Likewise, on or about June 25, 2009, Third Party Plaintiff Sajust filed a customer claim with the Trustee with regard to its underlying investments with FGLS that the Trustee has designated as Claim No. 011317. (*Id.*, Ex. D.) Third Party Plaintiff Weinberg filed a customer claim with the Trustee on or about June 22, 2009 with regard to his underlying investments with FGLS that the Trustee has designated as Claim No. 010678. (*Id.*, Ex. F.) The Trustee denied each of these claims because these Third Party Plaintiffs did not hold accounts at BLMIS. (*Id.* Exs. C, E, G.)[11] Instead, the Third Party Plaintiffs all claim to be investors in FGLS, which has itself filed a customer claim. (*See id.,* Ex. A.) FGLS's claim has not yet been determined. (*Id.* ¶ 4.)

---

[11] In addition to these claims, the Warshaw Plaintiffs and related persons and entities filed customer claims which have been denied because the claimants did not hold accounts at BLMIS. (*Id.* ¶3 n.2.)

## H. The Third Party Actions' Allegations Mimic the Allegations in the Trustee's Mendelow Complaint

The Third Party Plaintiffs seek to recover from the pool of customer property that was improperly transferred to Mendelow. This is the same property the Trustee seeks to recover in the Trustee's Mendelow Action, property that should be returned to the estate for equitable distribution to BLMIS creditors under the distribution scheme established by SIPA.

The Trustee outlines in his complaints the extent to which, the mechanisms by which, and the form in which property was transferred from BLMIS to the Mendelow Defendants. These transfers received by the Mendelow Defendants were of BLMIS funds, which are customer property. The Third Party Plaintiffs' complaints are based on the same operative facts as those alleged in the Trustee's complaints. Indeed, the Third Party Plaintiffs' complaints in some places simply parrot the Trustee's own allegations:

- "Mendelow received in excess of $5 million in fraudulent side payments from Madoff after the filing of the SEC enforcement actions." (New Decl., Ex. A, Warshaw Compl. ¶ 33.) "In all, Mendelow received in excess of $5 million in side payments from Madoff after the filing of the SEC enforcement actions." (*Id.*, Ex. B, Weinberg Compl. ¶ 22.) Combined, Mendelow received fraudulent side payments totaling approximately $5,116,000 from BLMIS." (Tr. Mendelow Compl. ¶ 87.)

- "Mendelow knew or should have known of BLMIS's Ponzi scheme because he engaged in the unlawful sale of unregistered securities at Madoff's direction and received money for doing so." (New Decl., Ex. B, Weinberg Compl. ¶ 21.) "[Mendelow] is not a casual investor and knew or should have known he was reaping the benefits of a fraudulent scheme. Moreover, Mendelow was on notice for over 15 years that all was not as it seemed at BLMIS. At least since he was fined by the SEC in 1993, and perhaps even earlier, he knew or should have known that BLMIS was engaged in fraud." (Tr. Mendelow Compl. ¶ 11.)

- "The Defendants also knew that BLMIS' management, compliance and audit responsibilities were fulfilled by Madoffs relatives and unqualified individuals." (New Decl., Ex. A, Warshaw Compl. ¶ 6.) "Defendants also knew that BLMIS's management, compliance and audit responsibilities were fulfilled by Madoff's relatives and unqualified individuals." (*Id.*, Ex. B, Weinberg Compl. ¶ 6.) "Despite its immense size in terms of assets under management, BLMIS was

substantially a family-run operation, employing many of Madoff's relatives and virtually no outside professionals." (Tr. Mendelow Compl. ¶ 102.)

- "The Defendants knew at all times of F&H's unsuitability to act as BLMIS' auditor." (New Decl., Ex. A, Warshaw Compl. ¶ 59.) "Defendants knew that F&H was not suitable to act as BLMIS's auditor." (*Id.*, Ex. B, Weinberg Compl. ¶ 48.) "BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom was semi-retired, with offices located in a strip mall. No experienced business person, especially one with 40 years of accounting experience as Mendelow has, could reasonably have believed it possible for any such firm to have competently audited an entity the size of BLMIS." (Tr. Mendelow Compl. ¶ 99.)

- "The Defendants, under the circumstances, should have, if acting in good faith, questioned Madoff regarding BLMIS' lack of an independent custodian to verify the existence and value of the securities purportedly held by it." (New Decl., Ex. A, Warshaw Compl. ¶ 56.) "Defendants, under the circumstances, should have questioned Madoff regarding BLMIS's lack of an independent custodian to verify the existence and value of the securities it purportedly held." (*Id.*, Ex. B, Weinberg Compl. ¶ 45.) ("BLMIS functioned as both investment manager and custodian of securities. This arrangement eliminated another frequently utilized check and balance in investment management by excluding an independent custodian of securities from the process, and thereby furthering the lack of transparency of BLMIS to other investors, regulators and outside parties." (Tr. Mendelow Compl. ¶ 101.)

- Elsewhere, the Warshaw Complaint simply repeats statements made in a declaration by Joseph Looby, a fraud examiner retained by the Trustee. (New Decl., Ex. A, Warshaw Compl. ¶ 22.)

As the Trustee alleges in his Mendelow Complaint, the Mendelow Defendants received over $11.4 million dollars in fraudulent transfers of fictitious profit from BLMIS, which consist of other customers' property. The Trustee seeks to recover this property, as well as $8 million in principal, through his action against the Mendelow Defendants. The Third Party Plaintiffs seek to recover from this same limited pool of funds, to the detriment of other customers of BLMIS.

# ARGUMENT

## I. THIS COURT HAS JURISDICTION OVER THE THIRD PARTY ACTIONS AND THIRD PARTY PLAINTIFFS

### A. This Court Has Subject Matter Jurisdiction Over All of the Third Party Actions and Personal Jurisdiction Over the Third Party Plaintiffs

This Court has subject matter jurisdiction to enjoin the Third Party Actions pursuant to 28 U.S.C. §§ 1334(b), 157(a) and (b), and the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).

Pursuant to 28 U.S.C. § 1334(b), district courts (and hence bankruptcy courts) have original jurisdiction of civil proceedings "arising under" and "arising in" and "related to" cases under Title 11.  *See Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp.)*, 2006 WL 1529357, at *6 (Bankr. S.D.N.Y. June 5, 2006).  Furthermore, bankruptcy courts have jurisdiction to "hear and determine . . . all core proceedings arising under Title 11, or arising in a case under Title 11 . . . ."  28 U.S.C. § 157(b)(1).  *See also* SIPA § 78eee(b)(4).  28 U.S.C. §§ 157(b)(2)(A) and (B) provide that core proceedings include, but are not limited to, "matters concerning the administration of the estate . . ." and the "allowance or disallowance of claims against the estate."  As this Court has held, in the Second Circuit, the test for determining whether "related to" jurisdiction exists is whether the outcome of a proceeding "might have any 'conceivable effect' on the bankruptcy estate."  *See Picard v. Stahl,* 443 B.R. 295, 310-11 (Bankr. S.D.N.Y. 2011) (Lifland, J.), *aff'd* Summary Order, *Fairfield Ret. Program v. Picard*, 11-CV-2392, ECF No. 26 (Dec. 5, 2011) ("*Stahl* Summary Order"); *see also Adelphia*, 2006 WL 1529357, at *4; *Publicker Indus. Inc. v. U.S.* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir. 1992); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998); *Stern v. Marshall*, -- U.S. --, 131 S. Ct. 2594, 2620 (2011) (the *Stern* holding does not "meaningfully change[] the division

of labor" in the current bankruptcy system); Order of U.S. District Court Judge William H. Pauley, III signed on 12/22/2011, at 13, *Picard v. Madoff*, 11-Misc.-0379 (WHP) (S.D.N.Y.) (noting that, under *Stern*, bankruptcy courts retain authority to determine common law claims to the extent required to determine the allowance or disallowance of claims).[12]

This Court has "arising under," "arising in," and "related to" jurisdiction because the Third Party Actions seek the proceeds of fraudulent transfers and would undermine the orderly administration of the liquidation of BLMIS and the Trustee's efforts to recover customer property and satisfy claims against BLMIS. *See, e.g.*, *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91-92 (2d Cir. 1988); *Adelphia*, 2006 WL 1529357, at *6-7; *In re AP Indus., Inc.*, 117 B.R. 798, 798 (Bankr. S.D.N.Y. 1990).

In addition, this Court has inherent ancillary jurisdiction concerning the Third Party Actions beyond the statutory grant of authority in order to interpret and enforce this Court's orders:

> Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of jurisdiction under 28 U.S.C. § 1334. Bankruptcy Courts must have the ability to enforce prior orders and secure or preserve the fruits and advantages of a judgment or decree rendered therein . . . . The proceeding being ancillary and dependent, the jurisdiction of the Court follows that of the original cause . . . .

*LTV Corp. v. Back* (*In re Chateaugay Corp.*), 201 B.R. 48, 62 (Bankr. S.D.N.Y. 1996) (Lifland, J.), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997) (internal citations and quotations omitted).[13]

---

[12] "Proceedings 'related to' the bankruptcy estate include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, n.5 (1995). The Trustee's Mendelow and FGLS Actions and the Third Party Actions all relate to and are based on Madoff's fraud and the Mendelow Defendants' involvement in that fraud. Hence, as discussed further herein, the prosecution of the Third Party Actions will have a significant effect on the administration of the bankruptcy estate.

[13] The U.S. Supreme Court's recent ruling concerning bankruptcy courts' constitutional authority in *Stern v. Marshall*, -- U.S. --, 131 S. Ct. 2594 (2011) has no bearing on this Court's subject-matter jurisdiction over the Third Party Plaintiffs. *See In re Teleservices Group, Inc.*, 456 B.R. 318, 335-36 (Bankr. W.D. Mich. 2011) ("Therefore, it

This Court also has personal jurisdiction over the Third Party Plaintiffs because they have filed customer claims with the Trustee in the BLMIS liquidation. As this Court has noted, "[i]t is well settled that by filing a proof of claim, a creditor submits to the bankruptcy court's equitable jurisdiction regarding adjudication of matters related to that claim, including avoidance actions." *Stahl*, 443 B.R. at 310 (*citing Langenkamp v. Culp*, 498 U.S. 42, 44 (1990)). A customer claim filed in a SIPA action is the equivalent of a proof of claim filed in a typical bankruptcy proceeding for purposes of submission to jurisdiction. *Stahl,* 443 B.R. at 310; *Keller v. Blinder* (*In re Blinder Robinson & Co.*), 135 B.R. 892, 896-97 (D. Col. 1991). In addition, the Bankruptcy Court has personal jurisdiction over the Third Party Plaintiffs to the extent necessary to protect its own jurisdiction over the property of the estate and to enforce the automatic stay. *See* 11 U.S.C. § 362(a) ("[A]n application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 [ . . . ] operates as a stay, *applicable to all entities . . .* " (emphasis added)); § 101(15) ("The term 'entity' includes person, estate, trust, governmental unit, and United States trustee.").

## II. THE THIRD PARTY ACTIONS VIOLATE THE EXISTING STAYS AND SHOULD OTHERWISE BE PRELIMINARILY ENJOINED

### A. The Third Party Actions Violate the Stay Orders and Automatic Stay

Both the Trustee and the Third Party Plaintiffs seek to recover customer property. The Third Party Actions violate the automatic stay, as well as the Stay Orders and the Claims Procedures Order, because the Third Party Plaintiffs seek to side-step the claims administration process established by this Court and to tap into the same pool of money as the Trustee. In

---

does not appear that *Stern* limits my ability under Authority Section 157(b)(2)(G) to enter final orders regarding the modification of the automatic stay."); *In re Ambac Financial Group, Inc.*, 457 B.R. 299, 308 (Bankr. S.D.N.Y. 2011) (*Stern* does not divest bankruptcy courts of jurisdiction to settle third-party claims). Likewise, *Stern* does not impact this Court's personal jurisdiction over Third Party Plaintiffs who filed customer claims with the Trustee, as this Court will not be finally adjudicating the Third Party Actions.

addition to attempting to recover property rightfully part of the BLMIS estate, the Third Party Plaintiffs each allege at least one claim that belongs to the Trustee, namely aiding and abetting claims that are based on generalized injuries suffered by all BLMIS investors. Accordingly, the Third Party Actions cannot be allowed to continue and should be enjoined.

### 1.     The Automatic Stay Applies

Section 362(a)(3) of the Bankruptcy Code provides that the filing of an application for the entry of a protective decree under section 5(a)(3) of SIPA (15 U.S.C. § 78eee(a)(3)) operates as a stay, applicable to all persons and entities of, *inter alia*, any act to exercise control over property of the estate. *See* 11 U.S.C. § 362(a)(3).[14] Similarly, section 362(a)(1) bars "the commencement or continuation . . . of a judicial . . . or other action or proceeding against the debtor . . . or to recover a claim against the debtor . . . ." 11 U.S.C. § 362(a)(1). A "claim against the debtor" encompasses claims against third parties, such as claims for fraudulently transferred funds, that are tantamount to claims against the debtor. *See FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 132 (2d Cir. 1992). Finally, section 362(a)(6) bars "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6). Thus, the automatic stay bars actions, like the ones at issue here, that seek recovery of (or recovery out of) the same fraudulent transfers sought by the Trustee and are therefore seeking to collect on the Trustee's fraudulent transfer claim against the debtor. Each of these provisions of section 362(a) is designed to prevent the dismemberment of the bankruptcy estate through interference, either directly or indirectly, with the trustee's control over estate property. *See*, *e.g.*, *Liberty Mut. Ins. Co. v. Off. Unsecured Creditors' Comm. of Spaulding Composite Co., Inc. (In re Spaulding Composites Co., Inc.)*, 207 B.R. 899, 908 (9th

---

[14] Furthermore, SIPA § 78eee(b)(2)(B) also provides for stay protection as to, *inter alia*, any suit against a debtor's property.

Cir. BAP 1997); *In re Burgess*, 234 B.R. 793, 799 (D. Nev. 1999); *In re HSM Kennewick, L.P.*, 347 B.R. 569, 572 (Bankr. N.D. Tex. 2006).

"The automatic stay is one of the most fundamental bankruptcy protections . . . ." *Picard v. Fox*, 429 B.R. 423, 430 (Bankr. S.D.N.Y. 2010). The stay provision is broad, and "prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding." *In re AP Indus., Inc.*, 117 B.R. at 798 (citations omitted). Similarly, in this case's SIPA context, the automatic stay "protects customers of BLMIS by fostering fair, uniform, and efficient distribution of customer property." *Picard v. Fox*, 429 B.R. at 430. The automatic stay is intended precisely to prevent those creditors who are able to act first from obtaining payment "in preference to and to the detriment of other creditors . . . [,]" which would be the exact result if the Third Party Actions were successfully prosecuted before the conclusion of the Trustee's Mendelow Action. *See In re AP Indus.*, 117 B.R. at 799 (*citing* H.R. REP. NO. 595, 95th Cong., 1st Sess. 340 (1977); S. REP. NO. 989, 95th Cong. 2d Sess. 49 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5835, 5963, 6296-97); *Keene Corp v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994) ("equality . . . is the governing principle").)

## 2. The Stay Orders Apply

In an order entered on December 15, 2008, the District Court declared that "all persons and entities are stayed, enjoined and restrained from directly or indirectly . . . interfering with any assets or property owned, controlled or in the possession of [BLMIS]." *SEC v. Bernard L. Madoff*, 08-CIV-10791 (LLS), ECF No. 4 ¶ IV (reinforcing automatic stay); *see also* Order on Consent Imposing Preliminary Injunction Freezing Assets and Granting Other Relief Against Defendants, Dec. 18, 2008, ECF No. 8, IX ("no creditor or claimant against [BLMIS], or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the

control, possession or management of the assets subject to the receivership."); Partial Judgment on Consent Imposing Permanent Injunction and Continuing Other Relief, Feb. 9, 2009, ECF No. 18, IV (incorporating and making the December 18, 2008 stay order permanent).

The Stay Orders are clearly applicable here, as the Third Party Plaintiffs are interfering with potential estate assets. *See Picard v. Fox,* 429 B.R. at 433; *Stahl*, 443 B.R. at 315, *aff'd Stahl* Summary Order.

### B. The Third Party Plaintiffs Seek the Recovery of Fraudulent Transfers Made to Mendelow in Violation of Section 362(a)(1)

The automatic stay prohibits third parties from seeking to recover fraudulently transferred funds: "a third-party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1)." *FDIC v. Hirsch* (*In re Colonial Realty Co.*), 980 F.2d 125, 131–32 (2d Cir. 1992). Such claims by creditors based on the fraudulent transfer of the debtor's assets are foreclosed by the seminal *Colonial Realty* decision. *See id.* at 132; *see also In re Keene Corp.*, 164 B.R. at 850 ("Where a [debtor's] creditor seeks to recover his or her claim from a transferee of [the debtor's] property, the creditor's action is stayed by section 362(a)(1)"); *Crysen/Montenay Energy Co. v. Esselen Assocs. Inc.* (*In re Crysen/Montenay Energy Co.*), 902 F.2d 1098, 1103 (2d Cir. 1990) (unsecured creditor may not obtain priority over other unsecured creditors, and action by such creditor to recover its claim against third party defendant found to be in violation of stay). Furthermore, the automatic stay precludes the Third Party Plaintiffs' attempt to recover from the proceeds of fraudulent transfers, regardless of the nomenclature of the cause-of-action. *See In re AP Indus., Inc.*, 117 B.R. at 801; *Stahl*, 443 B.R. at 314, *aff'd Stahl* Summary Order. The Third Party Plaintiffs' attempts to label certain of the relief they seek as damages does not assist them

because one cannot attempt to disguise an attempt to recover the proceeds of fraudulent transfers by claiming to seek money damages. *See id.*

The Third Party Plaintiffs essentially concede in their complaints that the losses they suffered were the loss of funds that were invested in BLMIS, and the damages that they seek to recover from Mendelow consist of funds that were wrongly transferred from BLMIS to the Mendelow Defendants:

- "Defendants exploited the trust that Larry Warshaw [] had developed as the result of KW serving as a long-time financial advisor, tax preparer and accountant for him and several of his family owned businesses [] to fraudulently induce Plaintiffs' investments into FGLS . . . for the purpose of investing with BLMIS.") (New Decl., Ex. A, Warshaw Compl. ¶ 7.)

- "Upon the advice of KW, as communicated principally by Mendelow, Warshaw and several of his relatives formed Sajust for the purpose of investing in FGLS. Sajust, and Carol Ann Enterprises, Inc. Pension Plan . . . lost a total of $2,676,434 in principal in FGLS." (*Id.* ¶ 8.)

- "The Defendants caused all of FGLS'[s] capital to be invested with BLMIS." (*Id.* ¶ 49.)

- "Defendants substantially aided and abetted BLMIS in defrauding Plaintiffs of $2,676,434." (*Id.* ¶ 108; s*ee also id.* ¶¶ 88, 93, 102, 106 (seeking compensatory damages on each cause of action "believed to be in excess of $2,676,434").)

- "Mendelow induced Plaintiff to invest personally in FGLS . . . for the purpose of investing with BLMIS. Upon the advice of Mendelow, Plaintiff invested a total of $1,000,000 in FGLS in 2003 and 2004. Plaintiff never withdrew any funds from FGLS and therefore has lost at least $1,000,000." (New Decl., Ex. B, Weinberg Compl. ¶7.)

- "Defendants caused all of FGLS's capital to be invested with BLMIS." (*Id.* ¶ 38.)

- "In and around 2002 and 2003, KW, through Mendelow, advised Plaintiff to invest in FGLS, which invested in BLMIS directly. Based on this advice, on or around September 9, 2003, Plaintiff invested $500,000 in FGLS, and on or around April 12, 2004, an additional $500,000." (*Id.* ¶ 56.)

- "Defendants advised Plaintiff that as of November 30, 2008, Plaintiff's account was valued in excess of $1,600,000, when, in fact, as a result of the wrongdoing, Plaintiff has likely lost his entire investment as he never withdrew any funds from FGLS." (*Id.* ¶ 60.)

- "Defendants substantially aided and abetted BLMIS and Madoff in defrauding Plaintiff of at least $1,600,000." (*Id.* ¶ 99; *see also id.* ¶¶ 77, 83, 92, 97 (seeking damages for each cause of action of "at least $1,600,000").)

All of the funds transferred from BLMIS constituted customer property because Madoff was admittedly operating a Ponzi scheme. These transfers should be recovered and distributed *pro rata* to all customers with valid claims.

## C. The Third Party Plaintiffs Seek to Collect or Recover on the Trustee's Claims in Violation of Section 362(a)(6)

The Third-Party Plaintiffs' attempt to recover (or recover from) the proceeds of fraudulent transfers held by Mendelow is likewise foreclosed by section 362(a)(6), which prohibits acts to collect or recover a claim against the debtor. To the extent the Third Party Actions seek to collect out of the property that the Trustee is pursuing in his fraudulent transfer claims, they violate section 362(a)(6) because they "prejudic[e] the Trustee's ability to litigate a competing avoidance claim on behalf of all creditors and [is] therefore inconsistent with the basic purpose of the automatic stay." *Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.)*, 108 F.3d 881 (8th Cir. 1997); *see also* COLLIER ON BANKRUPTCY ¶ 362.03(8)(c) (Alan A. Resnick & Henry J. Sommer eds., 16th ed. (2010) ("The stay does apply, however, to an attempt to collect a prepetition claim out of property that was fraudulently transferred by the debtor before the commencement of the case" although the property is not itself property of the estate); *see* also New Decl., Ex. C (transcript of District Court hearing in *Stahl*) at 33:8-19 (in affirming *Stahl* decision, finding *Just Brakes* "the closest case that I found, and which I believe is persuasive . . . ").

As discussed above, the Third Party Plaintiffs essentially concede in their complaints that the losses they suffered were the loss of funds that were invested into BLMIS, and the damages that they seek to recover from Mendelow consist of funds that were wrongly transferred from

BLMIS to the Mendelow Defendants. The Third Party Plaintiffs further appear to acknowledge

that the recoveries that they are seeking constitute funds derived from the BLMIS Ponzi scheme:

- "Before being sanctioned by the SEC, Mendelow earned a percentage of the funds he originated for Madoff. Subsequent to being sanctioned by the SEC, Mendelow demanded and received fraudulent payments from Madoff totaling in excess of $5 million based on the number of investors he solicited to invest with BLMIS. Further, Mendelow arranged for BLMIS accounts to be established for the benefit of himself and his family members which received fixed rates of return ranging from 28% to 43% per year." (New Decl., Ex. A, Warshaw Compl. ¶ 3.)

- "Mendelow extracted from Madoff an agreement to pay him kick-backs based on the amount of money former Telfran clients, or new clients, invested in BLMIS. In sum, Mendelow received in excess of $5 million in fraudulent side payments from Madoff after the filing of the SEC enforcement actions. Moreover, Madoff rewarded Mendelow by providing favorable rates of return, up to 40% per year, on BLMIS accounts established for the benefit of Mendelow and some of his family members." (*Id.* ¶ 33.)

- "Before being sanctioned by the SEC, Mendelow earned a percentage of the funds he originated for Madoff. Subsequent to being sanctioned by the SEC, Mendelow received payments from Madoff totaling more than $5 million for his solicitation of investors with BLMIS." (New Decl., Ex. B, Weinberg Compl. ¶ 3.)

- "Mendelow, Glantz and A&B shared the spread between the returns A&B received from BLMIS and the returns Telfran promised to its underlying investors. Consequently, Telfran received millions in profits for originating funds for BLMIS." (*Id.* ¶ 20.)

- "Mendelow extracted from Madoff an agreement to pay him kickbacks based on the amount of money former Telfran clients, or new clients, invested in BLMIS. In all, Mendelow received in excess of $5 million in side payments from Madoff after the filing of the SEC enforcement actions. Madoff rewarded Mendelow by providing favorable rates of return, up to 40% per year, on BLMIS accounts established for the benefit of Mendelow and some of his family members." (*Id.* ¶ 22.)

The Third Party Plaintiffs' attempt to recover, or recover from, the proceeds of fraudulent

transfers received by Mendelow is an improper attempt to collect on the Trustee's claims and is

thus precluded by section 362(a)(6).

### D. The Third Party Actions Seek to Obtain Customer Property in Violation of Section 362(a)(3)

As stated above, under section 78lll(4) of SIPA, "customer property" is defined as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." In this Ponzi scheme case, where all assets that were transferred were the property of other customers, ownership in such property can never be attributed to the debtor. All property was "unlawfully converted" by BLMIS and is, by definition, customer property.[15] In addition, to the extent BLMIS transferred any property to a third party as "proceeds," such property is customer property. SIPA § 78lll(4). As such, the customer property retained its character, notwithstanding the transfer to the Mendelow Defendants.[16]

Actions that have the effect of exercising control over property of the estate or customer property, or where the actions "necessarily implicate" a debtor's property interests, violate Bankruptcy Code § 362(a)(3), regardless of whether the debtor is named in the action. *Adelphia*, 2006 WL 1529357, at *3 (granting TRO because third-party suit threatened to interfere with debtor's realization of value of its assets and its reorganization); *In re MCEG Prods., Inc.*, 133 B.R. 232, 235 (Bankr. C.D. Cal. 1991). Indeed, section 362(a)(3) protects the *in rem* jurisdiction of the Court, and prohibits interference with the disposition of the assets that are under the

---

[15] The fact that Madoff unlawfully converted all of BLMIS's customers' property is indisputable. *See* Plea Hearing Transcript, *United States v. Madoff*, Case No. 09-CR-213(DC) (S.D.N.Y. Mar. 12, 2010); *see also In re Klein, Maus & Shire, Inc.*, 301 B.R. 408, 420 (Bankr. S.D.N.Y. 2003) (unlawful conversion includes misappropriation and misuse of customer property by the debtor).

[16] Section 78fff-2(c)(3) of SIPA became operative when the United States District Court for the Southern District of New York entered a protective order pursuant to SIPA § 78eee(b)(1) decreeing that the customers of BLMIS were in need of the protection afforded by SIPA. From that date, it was abundantly clear that there was insufficient customer property to pay all the claims in full, and therefore the Trustee began to seek recovery of all customer property wherever it may lie. As of such date, therefore, section 78fff-2(c)(3) deems transferred customer property to be the property of BLMIS.

Court's wing, whether or not the debtor is named as a defendant as part of that effort. And this is so regardless of the form the interference takes. *Adelphia*, 2006 WL 1529357, at *3. Critically, courts look to the substance and not the form of the purported action. *See 48th Street Steakhouse, Inc. v. Rockefeller Group, Inc.* (*In re 48th Street Steakhouse, Inc.*), 835 F.2d 427, 431 (2d Cir. 1987) ("If action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay.").

The Third Party Plaintiffs seek to recover from the pool of customer property that was improperly transferred to Mendelow—funds that the Trustee seeks to recover in connection with his lawsuit against the Mendelow Defendants. The Third Party Actions will "inevitably have an adverse impact on the property of the estate," *48th Street Steakhouse*, 835 F.2d at 431, and constitute a clear violation of the automatic stay. If the Third Party Plaintiffs succeed in their actions and obtain judgments against Mendelow, they will be obtaining estate assets. Even presuming that the Third Party Plaintiffs will not be successful in their actions, their continued prosecution will deplete assets otherwise potentially recoverable by the Trustee as customer property. (New Decl., Ex. C (transcript of District Court hearing in *Stahl*) at 36:11-12 ("continuing these [third-party] lawsuits at enormous expense is a waste of personal assets that the trustee seeks to recover . . . .").) Finally, the Third Party Plaintiffs' interference with the Trustee's prosecution of his avoidance causes of action against Mendelow—claims that are property of the estate, *see Jackson v. Novak (In re Jackson)*, 593 F.3d 171, 176 (2d Cir. 2010)— likewise violates section 362(a)(3).

### E. The Third Party Plaintiffs' Aiding And Abetting Fraud Claims Are Based on a Generalized Injury Common to All Creditors that Can Only be Brought By the Trustee

The Third Party Plaintiffs are further prohibited from bringing their aiding and abetting fraud claims because they are based on generalized injuries common to all creditors. The Second Circuit has held that the automatic stay "extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989). Thus, if the claims could be brought by any creditor, and even if they are brought against a third party whose assets should be part of the estate, they belong to the Trustee:

> **If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim**, and the creditors are bound by the outcome of the trustee's action. **Although the claims raised by [plaintiff] are not against the debtor but are against a third party, the same reasoning applies.** The claims, if proved, would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors. It therefore would be illogical to distinguish between this type of claim against a third party and a claim against the debtor.

*Id.* (emphasis added); *see also Stahl*, 443 B.R. at 312-13 (finding aiding and abetting fraud claims against Madoff's family members could only be brought by the Trustee under *St Paul* decision); *Fox*, 429 B.R. at 431-32 (finding generalized claims common to all BLMIS customer claimants belong exclusively to the Trustee); *In re 1031 Tax Group, LLC*, 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008) (looking "to the underlying wrongs as pleaded in the complaint and whether the plaintiff alleges a particularized injury" to determine that despite its label, claim belonged to the trustee); *In re Keene Corp.*, 164 B.R. at 850–55 (claims are barred by automatic stay where they allege generalized, indirect injury based on creditor status and recovery would benefit the estate); *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) ("The trustee is also the only party who can sue to represent the interests of the creditors as a class."); *Koch Ref. v.*

*Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987) (followed by *Apostolou*) (recognizing that a trustee may bring "only a general claim" and his or her right to bring a claim on behalf of creditors depends on whether the action vests in the trustee on behalf of all creditors or if it "accrues to specific creditors").  As the bankruptcy court found in *In re Keene*, "[e]ven if [such] claims are not, themselves, property of the estate, they represent attempts by creditors to collect claims against the debtor from third parties which the trustee is authorized to recover under his or her 'strong arm' or avoiding powers" and are stayed by § 362(a)(1).  164 B.R. at 855.

The Third Party Plaintiffs' aiding and abetting fraud claims allege no injury other than the common injury to all customers stemming from the Ponzi scheme.  (*See* New Decl., Ex. A, Warshaw Compl. ¶ 107-10; *id.*, Ex. B, Weinberg Compl. ¶¶ 98-101.)  The Third Party Plaintiffs allege that Mendelow "substantially assisted BLMIS and Madoff in committing and perpetuating a $50 billion Ponzi scheme by soliciting investors to provide funds for Madoff's scheme and by concealing the fraud through tax and accounting services [he] provided to Madoff and to some of his customers." (*Id.*, Ex. A, Weinberg Compl. ¶ 99; *see id.*, Ex. B., Warshaw Compl. ¶ 108 ("The Defendants aided and abetted BLMIS' $50 billion Ponzi scheme by soliciting investors to advance funds for Madoff's scheme and by concealing the fraud by providing tax and accounting services to Madoff and to some of his customers.").)  The perpetuation and concealment of Madoff's fraud injured all customers of BLMIS equally and are the types of claims that this Court has held to belong exclusively to the Trustee in *Stahl* and *Fox*.  *See Stahl*, 443 B.R. at 312-13; *Fox*, 429 B.R. at 431-32.  These claims are thus tantamount to claims against the debtor and can only be asserted by the Trustee.

## III. THE COURT SHOULD ENJOIN THE THIRD PARTY PLAINTIFFS PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE TO ALLOW FOR THE FAIR AND EQUITABLE ADMINISTRATION OF THE BLMIS ESTATE

This Court is empowered to extend the automatic stay to the Mendelow Defendants under section 105(a) of the Bankruptcy Code given, among other things, the adverse economic impact on the estate if the Third Party Actions are allowed to continue. *See, e.g.*, *Picard v. Fox*, 429 B.R. at 435-36; *Stahl*, 443 B.R. at 316-19. Continued prosecution of the Third Party Actions will diminish Mendelow's limited recoverable assets, which constitute in significant part avoidable transfers and potential property of the estate, recoverable by the Trustee for distribution to defrauded investors. The Trustee, under the supervision of this Court, is engaged in a complex recovery effort with an extremely broad scope. A preliminary injunction is necessary to allow the Trustee to properly administer this process.

### A. Standards for a Section 105(a) Injunction

Section 105(a) of the Bankruptcy Code, applicable here pursuant to section 78fff(b) of SIPA, bestows on bankruptcy courts broad discretion to "issue any order 'necessary or appropriate to carry out the provisions of [the Bankruptcy Code]' . . . ." 11 U.S.C. § 105(a). Courts in this Circuit have held that section 105(a) authorizes bankruptcy courts to issue injunctions and, when the court does so, the standard for Rule 7065 injunctions is inapplicable. *In re Probulk Inc.*, 407 B.R. 56, 63 (Bankr. S.D.N.Y. 2009). The Court may enjoin suits if (i) a third party suit would impair the court's jurisdiction with respect to a case before it or (ii) the third party suits threaten to thwart or frustrate the debtor's reorganization efforts and the stay is necessary to preserve or protect the debtor's estate.[17] *See In re Calpine Corp.*, 354 B.R. 45, 48

---

[17] Notwithstanding that the Rule 7065 standard need not be satisfied here, it easily is. There is no question that an infringement on this Court's jurisdiction constitutes "irreparable harm." *Adelphia*, 2006 WL 1529357, at *5. Moreover, the Trustee is likely to succeed on the merits of his complaint and demonstrate that the Third Party Plaintiffs have violated the automatic stay, as demonstrated herein. *See id.* at *4–5; *see Picard v. Fox*, 429 B.R. at 436 n.14; *Stahl*, 443 B.R. at 318 n.24.

(Bankr. S.D.N.Y. 2006), *aff'd*, 365 B.R. 401 (S.D.N.Y. 2007); *In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003) (internal citation omitted); *In re Lyondell Chem. Co.*, 402 B.R. 571, 588 n.37 (Bankr. S.D.N.Y. 2009); *In re Keene Corp.*, 162 B.R. 935, 944 (Bankr. S.D.N.Y. 1994); *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990), *aff'd in part*, 124 B.R. 635 (S.D.N.Y. 1991); *Garrity v. Leffler* (*In re Neuman*), 71 B.R. 567, 571–72 (S.D.N.Y. 1987); *C & J Clark Am., Inc. v. Carol Ruth, Inc.* (*In re Wingspread Corp.*), 92 B.R. 87, 92 (Bankr. S.D.N.Y. 1988); *LTV Steel Co., Inc. v. Bd. of Educ.* (*In re Chateaugay Corp.*), 93 B.R. 26, 29 (S.D.N.Y. 1988); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).

Courts have routinely used section 105(a) to extend section 362 to third party actions against non-debtor entities "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Picard v. Fox*, 429 B.R. at 434 (*quoting Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003)). For example, the District Court, in affirming a bankruptcy court decision enjoining certain third party litigation, held that an injunction was properly granted pursuant to section 105(a) and the court accordingly did not need to consider whether section 362 was also applicable. The court noted:

> Courts have consistently found that section 105 may be used to stay actions against non-debtors even where section 362 otherwise would not provide such relief, recognizing that section 105 grants broader authority than section 362.

*Nevada Power Co. v. Calpine Corp.* (*In re Calpine Corp.*), 365 B.R. 401, 409, n.20 (S.D.N.Y. 2007); *see also In re Lyondell Chemical Co.*, 402 B.R. 571 (Bankr. S.D.N.Y. 2009) (court, in granting a limited injunction to stay non-debtor litigation, noted that section 105(a) could be used to enjoin acts against non-debtor entities even when section 362 protection was not available); *In re Wingspread Corp.*, 92 B.R. at 94 (the basic purpose of section 105(a) is to enable the court to do whatever is necessary to aid its jurisdiction); *In re Neuman*, 71 B.R. at 571 (under section 105

the bankruptcy court has broad powers to issue injunctions notwithstanding the inapplicability of the automatic stay provisions).

**B. The Third Party Actions Threaten the Court's Jurisdiction and the Administration of the Estate and an Injunction is Necessary to Preserve and Protect the Estate**

As described above, the Third Party Actions target potential property of the estate that is the subject of a claims administration and asset recovery process of unprecedented magnitude. Any attempt by the Third Party Plaintiffs to leapfrog over other Madoff fraud victims harms not only those victims, but the orderly administration of the estate. Such an outcome would not only compromise the equitable distribution of customer property through the estate, a process sanctioned by this Court in its Net Equity Decision, affirmed by the Second Circuit (*see In re Bernard L. Madoff Sec., LLC*, 424 B.R. 122, *aff'd* 654 F.3d 229 (2d Cir. 2011)), but would run afoul of the general principle that creditors of a bankruptcy estate should not be permitted to race to the courthouse to recover preferentially to other creditors. *See, e.g., In re Keene Corp.*, 164 B.R. at 849-54; *In re AP Indus., Inc.* 117 B.R. at 799; *In re Johns-Manville Corp.*, 91 B.R. 225, 228-29 (Bankr. S.D.N.Y. 1988); *In re 1031 Tax Group, LLC*, 397 B.R. at 686. It would also frustrate the goals of SIPA, which seeks to return to each customer, on an equal basis, his or her net equity in the debtor. *See Fox*, 429 B.R. at 427 ("The statutory framework for the satisfaction of customer claims in a SIPA liquidation proceeding provides that customers share *pro rata* in customer property to the extent of their net equities . . ."); *Stahl*, 443 B.R. at 301, *aff'd Stahl Summary Order*.

The Third Party Plaintiffs' conduct is just the sort of behavior courts in this and other jurisdictions have prohibited time after time. *See, e.g.*, *In re Keene Corp.*, 164 B.R. at 849, 854; *In re AP Indus., Inc.*, 117 B.R. at 801–802; *In re Johns-Manville Corp.*, 91 B.R. at 228; *In re 1031 Tax Group, LLC*, 397 B.R. at 684–85; *In re Singer Co. N.V.*, 2000 WL 33716976 at \*5–7

(Bankr. S.D.N.Y. Nov. 3, 2000); *Apostolou*, 155 F.3d 876; *Baldwin-United Corp. v. Paine Webber Group, Inc.* (*In re Baldwin-United Corp.*), 57 B.R. 759 (S.D. Ohio 1985).

This Court already has twice held that a section 105(a) injunction was necessary to protect the court's jurisdiction and the administration of the liquidation. In *Picard v. Fox* and *Picard v. Stahl*, this Court granted the Trustee's application for a preliminary injunction, enjoining the defendants therein from prosecuting actions against parties being sued by the Trustee. In addition to finding that the third party plaintiffs in those actions had usurped causes of actions belonging to the Trustee, the Court found that the third party actions at issue in those cases would have "an immediate adverse economic consequence for the debtor's estate." *Stahl,* 443 B.R. at 316 (*quoting Queenie*, 321 F.3d at 287). While the Third Party Plaintiffs here may have some independent claims against the Mendelow, nevertheless, just as in *Fox* and *Stahl*:

> Both the Trustee and the [Third Party Plaintiffs] target the same limited pool of funds originating with BLMIS . . . . The [Third Party Plaintiffs' actions] thus threaten the Trustee's ability to collect on any judgment that may be awarded in connection with his pending adversary proceeding, to the detriment of the BLMIS estate.

*Fox*, 429 B.R. at 435; *see also Stahl*, 443 B.R. at 317. In affirming the *Stahl* decision, the District Court found that the third party actions at issue in that action "substantially interfere[d] with the ability of the trustee to move in his cases to recover assets for the estate as a whole," and had an adverse impact on property of the estate because the money recovered by the third-party plaintiffs in any judgment "would inevitably be the money that the trustee sought to recover." (*See* New Decl., Ex. C (transcript of District Court hearing in *Stahl*) at 29:9-16, 32:5-10.) The District Court found:

> And rather than have a profusion of claims, it's the rationale behind Section 362 and Section 105 to favor the trustee. It doesn't have to be for all time, but it has to allow the trustee the ability to pursue his actions and obtain rulings and finality on those rulings because the trustee is acting for the benefit of all creditors and not just a few.

36

(*Id.* at 31:16-21.)  The District Court further held that "continuing [the third party plaintiffs']

lawsuits at enormous expense is a waste of personal assets that the trustee seeks to recover," and

that "more persuasively to me than anything else, the profusion of lawsuits makes it extremely

difficult for the trustee to run his lawsuit expeditiously and economically in the interests of the

creditors of the estate."  (*Id.* at 36:11-16.)  Like the third-party actions in *Stahl*, the Third Party

Actions here hinder the Trustee's prosecution of his action against the Mendelow Defendants for

the benefit of all creditors, and should likewise be enjoined pursuant to section 105(a).

The Seventh Circuit in *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), faced with a

similar scenario, also found the use of a section 105(a) injunction appropriate.  This Court has

found *Apostolou* instructive, as has the District Court in *Stahl*.  *See Picard v. Fox*, 429 B.R. at

434-35; *Stahl*, 443 B.R. at 316-17; *see also* New Decl., Ex. C (transcript of District Court

hearing in *Stahl*) at 34:15-21.  In *Apostolou*, which was a liquidation proceeding, the Seventh

Circuit upheld the bankruptcy court's issuance of an injunction under § 105(a) to protect the

trustee's ability to marshal assets on behalf of the debtor's estate, even when the enjoined action

did not directly seek property of the debtor's estate.  *Apostolou*, 155 F.3d at 877–88.  The

bankruptcy court issued an injunction pursuant to section 105(a), which the district court

reversed.  The Seventh Circuit reversed the district court's determination that the bankruptcy

court had exceeded its authority in issuing the injunction, stating that:

> While the [investor plaintiffs'] claims are not "property of" the Lakes States
> estate, it is difficult to imagine how those claims could be more closely "related
> to" it.  They are claims to the same limited pool of money, in the possession of the
> same defendants, as a result of the same acts, performed by the same individuals,
> as part of the same conspiracy.  We can think of no hypothetical change to this
> case which would bring it closer to a "property of" case without converting it into
> one.  Even if the "related to" jurisdiction is not as broad in Chapter 7 cases as it is
> in Chapter 11 cases [internal citation omitted], it reaches at least this far, for to
> conclude that the "related to" jurisdiction under Chapter 7 does not extend to the

> circumstances of this case would be to amend the Bankruptcy Code to eliminate
> § 105 from Chapter 7 proceedings.

*Id.* at 882.  Notably, the Seventh Circuit acknowledged that, like the Third Party Plaintiffs here, some of the plaintiffs in *Apostolou* may have had claims against the defendants based on a "separate and distinct injury" to the individual plaintiff that could not be fully measured by the debts owed to the estate.  *Id.* at 881.  The court nevertheless held that the investors who were the plaintiffs in those actions "must wait their turn behind the trustee, who has the responsibility to recover assets of the estate on behalf of creditors as a whole . . . ."  *Id.*  Accordingly, the court stayed the underlying actions pending the outcome of the bankruptcy proceeding:  "At that point, the degree to which the Apostolou Plaintiffs have been compensated for their injuries through their share of the assets in the debtor's estate will be settled, and it will be possible for the district court to proceed with this action against the nondebtor defendants for whatever individualized damages may be proper."  *Id.* at 883.

Similarly, in *In re AP Industries, Inc.*, this Court noted that a bankruptcy court has "authority under § 105 broader than the automatic stay provisions of section 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings."  *In re AP Indus., Inc.*, 117 B.R. at 801 (citations omitted).  In *In re AP Industries*, the debtor sought to stay or enjoin actions commenced by a creditor against the debtor's directors and other third parties that were brought because the creditor objected to a transaction entered into by the debtor.  This Court found that it was appropriate to use section 105(a) to enjoin the creditor's action, stating:

> [T]his Court finds that it is also appropriate to issue an injunction pursuant to
> § 105 of the Code to stay the [creditor's] Actions in order to preserve and protect
> the Debtor's estate and reorganization prospects.  Not only may the outcome of
> the [creditor's] Actions affect the administration of this case, but the possibility of
> inconsistent judgments warrants the issuance of an injunction . . . .

*Id.* at 802; *see also In re Singer Co. N.V.*, 2000 WL 33716976 at *7. Akin to the claims the debtor's investors asserted in *Fox*, *Apostolou*, *AP Industries*, and *Stahl*, allowing the Third Party Plaintiffs to continue to prosecute their claims will impair this Court's jurisdiction over this proceeding and the Trustee's ability to marshal assets on behalf of the estate.

Moreover, allowing the Third Party Actions to continue could create confusion among other BLMIS investors and creditors who will feel compelled to initiate their own self-help proceedings and which could create a "race to the courthouse" environment, threatening the orderly administration of the estate. The statutory schemes created by SIPA and the Bankruptcy Code are specifically aimed at trying to avoid such a result. *See Sec. Investor Prot. Corp. v. Blinder, Robinson & Co., Inc.*, 962 F.2d 960, 965 (10th Cir. 1992) (quoting H.R. REP. NO. 1613, 91st Cong. 2d Sess. (1970) *reprinted in* 1970 U.S.C.C.A.N. 5254, 5262: SIPA "establishes procedures for the prompt and orderly liquidation of SIPC members . . ."); *see also In re Shea & Gould*, 214 B.R. 739, 750 (Bankr. S.D.N.Y. 1997) (Bankruptcy Code seeks to prevent "race to the courthouse"); *In re Rubin*, 160 B.R. 269, 281 (Bankr. S.D.N.Y. 1993) (same); *In re Russo*, 18 B.R. 257, 265 (Bankr. E.D.N.Y. 1982) (same).

An injunction will also avoid the possibility of inconsistent decisions, ensuring uniformity of decision, and will allow the Trustee to avoid appearing in the Third Party Actions, incurring needless litigation costs and distracting from the operation of a very complex liquidation proceeding. Principles of judicial economy further support the Trustee's request for a preliminary injunction. *See*, *e.g.*, *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (relying on principles of judicial economy to enjoin plaintiff from pursuing a similar action in bankruptcy court). Instead of having a court in another jurisdiction consider these

issues, this Court, that is already familiar with the relevant facts, can most expeditiously resolve the issues relating to customer property.

### C. The Third Party Actions Threaten to Undermine the Claims Administration Process

This Court already has approved a claims administration process and determined how customers' and other creditors' claims are to be valued and administered. As described above, this Court instituted the Claims Procedures Order, which sets forth a framework for the filing, determination and adjudication of claims. *In re Bernard L. Madoff Sec., LLC*, 424 B.R. 122.

Essentially, the Third Party Actions are attempts by Third Party Plaintiffs to satisfy claims relating to their investments in FGLS by circumventing the claims determination and allowance process, of which they are direct or indirect participants, and to take for themselves funds that otherwise would be recoverable by the Trustee and equitably distributed to customers and creditors of BLMIS in accordance with this Court's Net Equity Decision and the Net Equity Order. *In re Bernard L. Madoff Sec., LLC*, 424 B.R. 122; Adv. Pro. No. 08-01789, ECF No. 2020.)

In sum, the Third Party Actions seek to tap into the same pool of money as the Trustee and constitute an attempt by the Third Party Plaintiffs to jump ahead of other creditors to obtain a greater share of customer property than they would otherwise receive. The continued prosecution of the Third Party Actions is detrimental to the equitable distribution of customer property mandated by SIPA and this Court.

### D. The Trustee Would Pursue Any Transfers of Customer Property From the Mendelow Defendants to the Third Party Plaintiffs

As further grounds for the requested relief, the Trustee seeks an injunction to avoid unnecessary proceedings in connection with property that is under this Court's jurisdiction. In the event that any of the Third Party Plaintiffs were to recover customer property from

Mendelow through the Third Party Actions, the Trustee would then seek to avoid the transfer of such funds on the grounds that the Third Party Plaintiffs, as subsequent transferees, took without value and with knowledge of the voidability of the transfers. *See* 11 U.S.C. §§ 548, 549, 550.

Accordingly, the Court should preliminarily enjoin the Third Party Plaintiffs from litigating against Mendelow, pending the completion of the Trustee's Mendelow Action.

## CONCLUSION

The Trustee respectfully requests that the Court: (i) declare that the Third Party Actions violate the Stay Orders, section 78eee(b)(2)(B) of SIPA and the automatic stay and are void *ab initio* with respect to Mendelow; and (ii) issue a preliminary injunction prohibiting the Third Party Plaintiffs from pursuing the Third Party Actions, as against Mendelow, or any other actions as against the Mendelow Defendants, and from pursuing discovery from the Trustee, until such time as the Trustee has completed his action against the Mendelow Defendants.

Dated: New York, New York
       February 23, 2012

**BAKER & HOSTETLER LLP**

*/s/* Deborah H. Renner
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Deborah H. Renner
Email:  drenner@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Geraldine Ponto
Email: gponto@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Robertson D. Beckerlegge
Email: rbeckerlegge@bakerlaw.com
Essence Liburd
Email: eliburd@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com
Matthew J. Moody
Email: mmoody@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*